T.C. Memo. 2009-80


UNITED STATES TAX COURT


PETER ACKERMAN AND JOANNE LEEDOM-ACKERMAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 13947-06, 26400-06.    Filed April 15, 2009.


<u>George W. Connelly, Jr.</u>, <u>Linda S. Paine</u>, and <u>Pamela E. Powers</u>, for petitioners.

<u>Christopher A. Fisher</u> and <u>Richard S. Bloom</u>, for respondent.


Table of Contents

FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . 4

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Peter Ackerman . . . . . . . . . . . . . . . . . . . . . . . . 5
    Perry Lerner . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Don Ackerman . . . . . . . . . . . . . . . . . . . . . . . . . 8
    Jason Ackerman . . . . . . . . . . . . . . . . . . . . . . . . 8
    Jeffrey Deutschman . . . . . . . . . . . . . . . . . . . . . . 9

Somerville S Trust and Certain
    Other Entities That It Owned . . . . . . . . . . . 9
Deena Patriarca . . . . . . . . . . . . . . . . . . 11
Rockport Advisors . . . . . . . . . . . . . . . . . 11
Crown Capital . . . . . . . . . . . . . . . . . . 13
Petitioners' Tax Returns . . . . . . . . . . . . . 15
Notices of Deficiency . . . . . . . . . . . . . . . 16

Claimed Business Expense Deductions . . . . . . . . . . . 16

Claimed Deduction for the
    Protection of Business Reputation . . . . . . . . . . 32
    Funds Advanced to ECC . . . . . . . . . . . . . . 33
    Book and Tax Treatment of the $7,850,000 of
        Advanced Funds by Somerville and by Santa Monica . 37

Claimed Losses With Respect to ISI . . . . . . . . . . . 40

Claimed Theft Loss Deduction . . . . . . . . . . . . . . 42

Accuracy-Related Penalty Under Section 6662(a) . . . . . . 49

OPINION . . . . . . . . . . . . . . . . . . . . . . . . . 54

Burden of Proof . . . . . . . . . . . . . . . . . . . . . 54

Evaluation of Evidence on Which Petitioners Rely . . . . . 56
    Testimonial Evidence . . . . . . . . . . . . . . . . 56
        Mr. Ackerman's Testimony . . . . . . . . . . . 57
        Mr. Lerner's Testimony . . . . . . . . . . . . 57
        Don Ackerman's Testimony . . . . . . . . . . . 57
        Jason Ackerman's Testimony . . . . . . . . . . 58
        Mr. Deutschman's Testimony . . . . . . . . . . 58
        Ms. Patriarca's Testimony . . . . . . . . . . . 58
        Mr. Braddock's Testimony . . . . . . . . . . . 59
        Mr. Levinton's Testimony . . . . . . . . . . . 59
    Documentary Evidence . . . . . . . . . . . . . . . . 59

Claimed Business Expense Deductions . . . . . . . . . . . 60
    Petitioners' Cost Company or Agency Argument . . . . . 61
    Petitioners' Compensation Argument . . . . . . . . . . 71

Claimed Deduction for the
    Protection of Business Reputation . . . . . . . . . . 88

Claimed Losses With Respect to ISI . . . . . . . . . . . 96

Claimed Theft Loss Deduction . . . . . . . . . . . . . . 104

Accuracy-Related Penalty Under Section 6662(a) . . . . . . 108

APPENDIX A . . . . . . . . . . . . . . . . . . . . . . . . 117

APPENDIX B . . . . . . . . . . . . . . . . . . . . . . . . 119

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, Judge: Respondent determined the following defi-ciencies in, an addition under section 6651(a)(1)[1] to, and accuracy-related penalties under section 6662(a) on petitioners' Federal income tax (tax):

| Year | Deficiency | Addition to Tax Under Sec. 6651(a)(1) | Accuracy-Related Penalty Under Sec. 6662(a) |
|------|-----------|--------------------------------------|---------------------------------------------|
| 1997 | $1,022,612 | -- | -- |
| 1998 | 163,350 | -- | -- |
| 2000 | 657,877 | -- | -- |
| 2002 | 771,330 | $20,959.40 | $154,266.00 |
| 2004 | 206,239 | -- | 41,247.80 |

The issues remaining for decision are:[2]

(1) Are petitioners entitled for each of their taxable years 1997, 1998, 2000, 2002, and 2004 to deduct certain claimed business expenses under section 162(a)? We hold that they are not.

---

[1]All section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Issues (2), (3), and (4) set forth below are affirmative issues that petitioners raised in the pleadings and that do not relate to any determinations in the notices of deficiency.

(2) Are petitioners entitled for their taxable year 1997 to deduct under section 162(a) certain funds that they claim petitioner Peter Ackerman advanced to a certain corporation in order to protect his business reputation?  We hold that they are not.

(3) Is a certain loss with respect to a company in which petitioner Peter Ackerman indirectly owned an interest a passive activity loss within the meaning of section 469(a) for each of petitioners' taxable years 1998 and 2000?  We hold that it is.

(4) Are petitioners entitled for their taxable year 2002 to deduct a claimed theft loss under section 165(a)?  We hold that they are not.

(5) Are petitioners liable for each of their taxable years 2002 and 2004 for the accuracy-related penalty under section 6662(a)?  We hold that they are.

FINDINGS OF FACT[3]

Some of the facts have been stipulated and are so found except as stated below.

Petitioners resided in Washington, D.C., at the time they filed the petition in each of these cases.

---

[3]We found the record in these cases to have been not well developed, inconclusive, and/or not reliable in many respects, including certain material respects.  Although the gaps in the record are substantial in many instances, and therefore our findings of fact are incomplete and/or disconnected in those instances, we have not undertaken to note every instance in which the record does not contain reliable evidence that would have enabled us to find all the facts relevant to our deciding the issues presented.

Background

Peter Ackerman

Petitioner Peter Ackerman (Mr. Ackerman) received a bachelor's degree from Colgate University and a master's degree in law and diplomacy and a Ph.D. degree from the Fletcher School of Law and Diplomacy of Tufts University (Fletcher School).

From the mid-1970s until January 1990, Drexel Burnham Lambert (Drexel) employed Mr. Ackerman in various positions.[4] The first position that Mr. Ackerman held at Drexel was assistant to the president. From 1978 to 1989, Mr. Ackerman was in charge of Drexel's so-called special projects group. As head of that group, Mr. Ackerman worked on, inter alia, the restructuring and the financing of various businesses. Drexel received various types of fees, equity interests, and investment opportunities in connection with its special projects work.

In early 1990, Mr. Ackerman moved to London, England (London), where he became a visiting scholar at the International Institute for Strategic Studies, a premier think tank that concentrated on issues relating to international security.

While living in London, Mr. Ackerman registered with English authorities as a person undertaking a business and formed, owned

---

[4]While at Drexel, Mr. Ackerman worked on, inter alia, the restructuring of Penn Central Railroad and Resorts International and the formation and the financing of a company for the purpose of taking over a certain other company that operated supermarkets.

with petitioner Joanne Leedom-Ackerman (Ms. Ackerman), and served as the director of a company known as Rockport Capital Limited. The principal activity of that company was providing certain consulting services.

From 1990 to 1992, Ms. Ackerman owned a company known as Rockport Consultants, Inc. (Rockport Consultants), that was incorporated as a Delaware corporation on September 5, 1990, and that filed an election to be taxed as an S corporation on or about January 1, 1991. Rockport Consultants was engaged in the business of providing certain consulting services. While residing in London, Mr. Ackerman served as the director of Rockport Consultants and acted on behalf of that company in providing certain consulting services. The consulting services that Rockport Consultants provided included certain consulting services provided to Saatchi & Saatchi Company Plc. (Saatchi & Saatchi) with respect to, inter alia, its financing and its capital structure. In exchange for those services, Rockport Consultants received from Saatchi & Saatchi fees of more than $5 million.

On or about January 3, 1992, Rockport Consultants changed its name to Rockport Financial, Inc. (Rockport Financial).

During each of Rockport Financial's taxable years 1992, 1993, and 1994, Ms. Ackerman was its sole stockholder.[5]

At the end of 1995, Mr. Ackerman left London and returned to the United States.  Thereafter, as discussed in more detail below, Mr. Ackerman became interested in and explored various investment opportunities.

During each of the years 1997, 1998, 2000, 2002, and 2004, the years at issue, Mr. Ackerman devoted 40 to 50 percent of his time to social and charitable causes.  For example, Mr. Ackerman served on the respective boards of CARE and Freedom House and as chairman of the Fletcher School.

Perry Lerner

While Mr. Ackerman was living in London, he met Perry Lerner (Mr. Lerner).  Mr. Lerner received a bachelor's degree from Claremont McKenna College and a law degree from Harvard University.  From approximately 1980 to 1996, Mr. Lerner practiced law as a tax attorney with the law firm of O'Melveny & Myers, LLP (O'Melveny & Myers).  In that capacity, Mr. Lerner represented Mr. Ackerman with respect to various legal matters.  Around 1996, Mr. Lerner resigned from O'Melveny & Myers in order to provide certain legal services for Mr. Ackerman on a full-time basis.

---

[5]As discussed below, on or about Apr. 15, 1996, Rockport Financial changed its name to Rockport Capital, Inc. (Rockport Capital).

In February 1996, Mr. Lerner formed Rockport Advisors, Inc. (Rockport Advisors). In January 1997, he formed Crown Capital Group, Inc. (Crown Capital). As discussed in more detail below, Mr. Lerner used Rockport Advisors and Crown Capital in order to provide certain services with respect to certain investment opportunities that Mr. Ackerman wanted to explore and/or pursue.

### Don Ackerman

Don Ackerman is the older brother of Mr. Ackerman. From around 1965 to around the end of 1997, Don Ackerman managed the business operations of Economy Color Card, Inc. (ECC), a supplier of wallpaper sample books and sample cards for paint, rugs, and wood pieces.

### Jason Ackerman

Jason Ackerman is the son of Don Ackerman and the nephew of Mr. Ackerman. Jason Ackerman received an undergraduate degree in economics and business management from Boston University. Beginning around 1990, Jason Ackerman worked as an investment banker (1) for about a year at Drexel and (2) for about seven years at Donaldson Lufkin Jenrette. While serving as an investment banker, Jason Ackerman worked on several business deals that involved the formation of companies for the purpose of taking over certain other companies that operated supermarkets.

<u>Jeffrey Deutschman</u>

Jeffrey Deutschman (Mr. Deutschman) received a bachelor's degree in history and economics from Columbia University and a master's degree in business administration from the Graduate School of Management of the University of California, Los Angeles. From 1981 through 1997, Mr. Deutschman worked for or was a partner in various private equity firms.

Mr. Deutschman first met Mr. Ackerman in 1981 while Mr. Ackerman was working for Drexel. At that time, Mr. Deutschman had been working for a private equity firm for which Drexel had been interested in financing an acquisition.

<u>Somerville S Trust and Certain</u>
<u>Other Entities That It Owned</u>

During each of the years at issue, Mr. Ackerman was treated as the owner of Somerville S Trust, a so-called grantor trust under section 671. For all relevant taxable years of petitioners, all of the income, deductions, and credits of Somerville S Trust were includible in the computation of their taxable income and credits. During each of the years at issue, Mr. Lerner was the trustee of Somerville S Trust and was fully empowered to transfer or invest its assets.

On or about April 15, 1996, Rockport Financial changed its name to Rockport Capital. During each of the years at issue,

Somerville S Trust was the sole stockholder of Rockport Capital.[6]

Pursuant to a limited liability company agreement dated December 10, 1996, Rockport Capital and Mr. Lerner formed Santa Monica Pictures, LLC (Santa Monica). Since its formation, Santa Monica has been subject to the unified partnership provisions of sections 6221 through 6234. On December 11, 1996, Somerville S Trust became a member of, and received a 99.882-percent profits interest in, Santa Monica. During 1997 and thereafter, the members of Santa Monica were Somerville S Trust, Rockport Capital, and Mr. Lerner.

Pursuant to a limited liability company agreement dated December 15, 1997, Somerville S Trust formed Somerville, LLC (Somerville). From its formation until December 29, 1997, Somerville S Trust was the sole member of Somerville. On December 29, 1997, Somerville S Trust contributed its interest in Somerville to Santa Monica, and Santa Monica became, and has remained, the sole member of Somerville.[7]

---

[6]The record does not disclose when or how Somerville S Trust acquired its interest in Rockport Capital.

[7]Somerville was a "disregarded" entity under secs. 301.7701-2(a) and 301.7701-3(a) and (b)(1)(ii), Proced. & Admin. Regs., and was not required to file a tax return for any of the years at issue. Nonetheless, as discussed in more detail below, it prepared Form 1065, U.S. Return of Partnership Income (Form 1065), for each of those years.

<u>Deena Patriarca</u>

From 1984 until February 1990, Drexel employed Deena Patriarca (Ms. Patriarca) as an assistant to Mr. Ackerman. Shortly thereafter, Rockport Capital or one of its predecessors employed her.[8] During each of the years at issue, Ms. Patriarca handled (1) the bookkeeping, accounting, payroll, and similar functions for Rockport Capital and (2) the bookkeeping for Somerville S Trust.

<u>Rockport Advisors</u>

As discussed above, in February 1996, Mr. Lerner formed Rockport Advisors, which was located in Washington, D.C.[9] During

---

[8]For several months after Ms. Patriarca left Drexel, she provided certain unidentified services for Mr. Ackerman in his personal capacity.

[9]The record is very sparse as to the activities of Rockport Advisors during each of the years at issue. The record, however, does establish that (1) as of Aug. 25, 1995, Somerville S Trust was a member of, and had agreed to make capital contributions totaling $100 million to, Cumberland Investment Partners, LLC (Cumberland Investment), (2) the purpose of Cumberland Investment was to invest in securities and other similar investments, and (3) on Mar. 1, 1996, Rockport Advisors agreed to provide certain unidentified administrative services to Cumberland Investment.

The record also establishes that on Mar. 1, 1996, Rockport Advisors and two individuals entered into an employment agreement (Rockport Advisors employment agreement) under which Rockport Advisors was to, and did, employ those two individuals (two Rockport Advisors employees). That agreement provided that Somerville S Trust was to "bear the costs of the services performed by * * * [the two Rockport Advisors employees] on behalf of Rockport Advisors." The Rockport Advisors employment agreement further provided the following mechanism by which Somerville S Trust was to recoup those costs:

(continued...)

each of the years at issue, Mr. Lerner was the sole owner of
Rockport Advisors. At all relevant times, Rockport Advisors
maintained books and records, had employees, and generated
income.

Rockport Advisors filed Form 1120, U.S. Corporation Income
Tax Return (Form 1120), for each of its taxable years 1997, 1998,
and 2000.[10] In each of those returns, Rockport Advisors showed
its business activity as "ADVISORY SERVICES" and its product or
service as "CONSULTING".

In Form 1120 for its taxable year 1997, Rockport Advisors
reported total income of $1,600,196, total deductions of
$1,909,634, and a loss of $309,438. In Form 1120 for its taxable
year 1998, Rockport Advisors reported total income of $951,395,
total deductions of $1,144,857, and a loss of $193,462. In Form

---

[9](...continued)
     To allow Somerville [S Trust] to recoup these costs,
     * * * [the two Rockport Advisors employees were to]
     cause to be paid to Somerville [S Trust] 25% of any
     performance-based fees * * * [they] receive in the
     future while * * * employed by Rockport Advisors from
     clients other than Cumberland [Investment], until
     Somerville [S Trust] has received an amount equal to
     the unrecovered balance in its "**Recoupment Account**."
     * * *

The record further establishes that in 2000 and 2001 the two
Rockport Advisors employees caused $60,000 and $100,031.73,
respectively, to be paid to Rockport Advisors in order for
Somerville S Trust to recoup the costs that it had incurred with
respect to the services performed by them.

[10]The record does not disclose whether Rockport Advisors
filed Form 1120 for any of the other taxable years at issue.

1120 for its taxable year 2000, Rockport Advisors reported total income of $1,296,676, total deductions of $1,239,039, and taxable income of $57,637.

Crown Capital

As discussed above, in January 1997, Mr. Lerner formed Crown Capital, which was located in New York City.  On or about January 1, 1998, Crown Capital filed an election to be taxed as an S corporation.  At all relevant times, Mr. Lerner owned 49 percent and petitioners' nephew Jason Ackerman owned 51 percent of Crown Capital.  Crown Capital never issued any of its stock to Mr. Ackerman.

At all relevant times, Crown Capital maintained books and records, had employees, and generated income.[11]  As discussed below, during at least certain of the years at issue, Crown Capital provided certain services, including "consultation, advice and direct management assistance * * * with respect to operations, strategic planning, [and] financing", to certain companies in which Mr. Ackerman indirectly invested.  In exchange for those services, those companies agreed to pay certain management fees to Crown Capital.

---

[11]From 1997 until early 2002, Sheila Innes, an employee of Crown Capital, maintained Crown Capital's books and records. Around early 2002, Crown Capital began winding down its business operations and shipped its books and records to Ms. Patriarca.

Mr. Ackerman, whose reputation in finance far exceeded the respective reputations of the employees of Crown Capital, was involved in the hiring of Crown Capital's employees in that he told Crown Capital whom to hire or consented to its hiring of certain employees.  By the end of 1997, Crown Capital had about 15 employees, including Mr. Lerner, Jason Ackerman, and Don Ackerman.[12]  In 1998, Mr. Deutschman joined Crown Capital and served as its managing director.  It was Mr. Deutschman's understanding that Crown Capital was established to provide certain services regarding the various companies in which Mr. Ackerman invested or intended to invest.

Mr. Lerner, Jason Ackerman, and Mr. Deutschman were the key employees of Crown Capital.  Mr. Ackerman negotiated the respective salaries that Crown Capital was to pay to those key employees.

Crown Capital filed Form 1120 for its taxable year 1997 and Form 1120S, U.S. Income Tax Return for an S Corporation (Form 1120S), for each of its taxable years 1998 and 2000.[13]  In each

---

[12]The record does not disclose when Don Ackerman began working for Crown Capital.  We presume that shortly after Don Ackerman stopped managing the operations of ECC, which was sometime around the end of 1997, he began working for Crown Capital.

[13]The record does not disclose whether Crown Capital filed Form 1120S for any of the other taxable years at issue.

of those returns, Crown Capital showed its business activity as "CONSULTING" and its product or service as "INVESTMENT ADVICE".

In Form 1120 for its taxable year 1997, Crown Capital reported total income of $1,754,632, total deductions of $1,735,293, and taxable income of $19,339.  In Form 1120S for its taxable year 1998, Crown Capital reported total income of $5,649,920, total deductions of $5,549,062, and "Ordinary income * * * from trade or business activities" of $100,858.  In Form 1120S for its taxable year 2000, Crown Capital reported total income of $6,509,302, total deductions of $6,194,276, and "Ordinary income * * * from trade or business activities" of $315,026.

Petitioners' Tax Returns

Petitioners jointly filed Form 1040, U.S. Individual Income Tax Return (joint return), for each of their taxable years 1997, 1998, 2000, 2002, and 2004.

Petitioners included Schedule C, Profit or Loss From Business (Schedule C), as part of the 1997 joint return (1997 Schedule C), the 1998 joint return (1998 Schedule C), the 2000 joint return (2000 Schedule C), the 2002 joint return (2002 Schedule C), and the 2004 joint return (2004 Schedule C).  In each of those schedules, petitioners showed the "Principal business or profession, including product or service" as "INVESTMENTS AND BANKING" and the "Business name" as "PETER ACKERMAN".

Petitioners also included Schedule E, Supplemental Income and Loss (Schedule E), as part of the 1997 joint return, the 1998 joint return, the 2000 joint return, the 2002 joint return, and the 2004 joint return. In each of those schedules, petitioners reported, inter alia, Somerville S Trust's allocable share of any income or loss, including any dividend income, from each of the limited liability companies in which that trust directly or indirectly invested.[14]

### Notices of Deficiency

On April 26, 2006, respondent issued to petitioners a notice of deficiency with respect to their taxable years 1997, 1998, and 2000 (notice for 1997, 1998, and 2000). On November 17, 2006, respondent issued to petitioners a notice of deficiency with respect to their taxable years 2002 and 2004 (notice for 2002 and 2004).

### Claimed Business Expense Deductions

During the years at issue, various individuals and companies sought Mr. Ackerman's advice with respect to certain projects that those individuals and companies were considering. Mr.

---

[14]For convenience, instead of referring to what was reported by petitioners as Somerville S Trust's allocable share of any income or loss, including any dividend income, from each of the limited liability companies in which that trust directly or indirectly invested, we shall generally refer only to the tax reporting by those limited liability companies which are involved in certain of the issues presented and in which Somerville S Trust was a direct or indirect investor.

Ackerman and Crown Capital's key employees (namely, Mr. Lerner, Jason Ackerman, and Mr. Deutschman) examined each of those projects in order to determine whether it was a project that Mr. Ackerman wanted to pursue.  Mr. Ackerman and Crown Capital's key employees (namely, Mr. Lerner, Jason Ackerman, and Mr. Deutschman) examined a total of about six to ten potential projects for every project that Mr. Ackerman decided to pursue.  It was Mr. Ackerman who determined which employees of Crown Capital were to work on the projects that he wanted to pursue.

During the years at issue, Mr. Ackerman pursued at least five major projects (major projects).[15]  As discussed in more detail below, each of those projects pertained to a company in which Mr. Ackerman indirectly made a substantial investment.[16]  As part of its business, Crown Capital (1) provided certain due

_____

[15]Except for a project that pertained to a company that purchased cellular phone spectrum licenses and that was facing financial difficulty, the record does not disclose the number or the nature of any projects, other than the five major projects, that Mr. Ackerman may have explored and/or pursued during the years at issue.

[16]Mr. Ackerman did not directly own an interest in any of the companies to which the major projects pertained.  Instead, as discussed in more detail below, Mr. Ackerman invested in each of those companies through one or more entities in which he directly or indirectly owned a substantial interest, such as Somerville S Trust, Somerville, and Santa Monica.  Although Mr. Ackerman did not directly own an interest in any of the companies to which the major projects pertained, in discussing those projects, we shall sometimes for convenience not describe Mr. Ackerman's investments and ownership interests in those companies as indirect investments and indirect ownership interests.

diligence services in connection with the major projects and (2) monitored the progress of Mr. Ackerman's respective investments in the companies to which those projects pertained.

Mr. Ackerman maintained no books and records with respect to the projects that he pursued during the years at issue. Nor did he have any employees or lease agreements with respect to those projects.

One major project that Mr. Ackerman pursued involved the financing of a resort theater business. On a date not disclosed by the record, Mr. Lerner introduced Mr. Ackerman to an individual (resort theater developer) who had been in the process of acquiring a small chain of movie theaters located in certain resort areas and who had been having difficulty financing those acquisitions.

On February 18, 1999, Santa Monica, virtually all of which Mr. Ackerman owned indirectly, invested $14 million in Resort Theaters of America, Inc. (Resort Theaters), in exchange for a 100-percent ownership interest in Resort Theaters. On the same date, Crown Capital entered into a management services agreement with Resort Theaters (Resort Theaters management service agreement). Pursuant to that agreement, in exchange for certain fees to be paid by Resort Theaters to Crown Capital, Crown Capital was to provide to Resort Theaters certain management services, including "consultation, advice and direct management assistance to

* * * [Resort Theaters] with respect to operations, strategic planning, financing and other aspects of the business of [Resort Theaters]".

On certain dates not disclosed by the record, Crown Capital and Mr. Ackerman assisted the resort theater developer in obtaining certain financing for Resort Theaters.[17]

The business operations of Resort Theaters were ultimately unsuccessful, and it did not pay to Crown Capital any of the fees required by the Resort Theaters management service agreement.

Santa Monica reported in Form 1065 for its taxable year 2000 a long-term capital loss of $14 million with respect to its investment in Resort Theaters.[18]

Another major project that Mr. Ackerman pursued involved the formation of an investment management company. Mr. Ackerman learned of that project through Jay Regan (Mr. Regan), whom Mr. Ackerman had known for many years.

On a date not disclosed by the record in or shortly before 1999, Mr. Regan introduced Mr. Ackerman to Marek Fludzinski (Mr.

---

[17]The record does not disclose whether Mr. Ackerman assisted Resort Theaters in obtaining financing before or after Santa Monica invested in that company.

[18]In Form 1065 for its taxable year 2000, Santa Monica reported with respect to its investment in Resort Theaters that (1) it had acquired its interest in Resort Theaters on Feb. 18, 1999; (2) its basis in that interest was $14 million; and (3) it had sold that interest on Dec. 31, 2000. In that form, Santa Monica made no entry in the column headed "Sales price" with respect to the interest in Resort Theaters that it reported it had sold.

Fludzinski). Mr. Fludzinski had been managing a fund for a large investment partnership and wanted to leave that partnership in order to start his own investment management business. From 1999 to 2000, Mr. Ackerman assisted Mr. Fludzinski in an undisclosed manner in forming Thales Fund Management, LLC (Thales Fund Management), which was to be the manager of an investment company called Thales Fund, LP (Thales Fund). Mr. Ackerman asked Mr. Lerner to provide assistance with respect to certain of the legal matters pertaining to the formation of Thales Fund Management. On a date not disclosed by the record, Mr. Ackerman and Mr. Regan made investments of $30 million and $20 million, respectively, with respect to the project involving the creation of Thales Fund Management.[19]

Another major project that Mr. Ackerman pursued involved starting a towel manufacturing business in Mexico for Davidson Cotton Holding Corp. (Davidson Cotton). Mr. Ackerman

---

[19]The record does not establish what ultimately happened to the investment of $30 million that Mr. Ackerman made with respect to the project involving the creation of Thales Fund Management. Nor does the record establish the specific entity or entities in which or through which Mr. Ackerman made that investment. However, Somerville reported in Form 1065 distributive shares of taxable income generated by the operations of (1) Thales Fund Management and Thales Capital, LLC (Thales Capital), for each of Somerville's taxable years 1999 through 2004 and (2) Thales Fund, for each of Somerville's taxable years 1999, 2000, 2002, and 2004. We presume from Somerville's Form 1065 for each of its taxable years 1999 through 2004 that Mr. Ackerman made his investment of $30 million through Somerville.

learned of that project through his brother Don Ackerman shortly after Don Ackerman began working for Crown Capital.

On December 3, 1999, Mr. Ackerman invested in Davidson Cotton.[20] On the same date, Crown Capital entered into a management services agreement with Davidson Cotton (Davidson Cotton management services agreement). Pursuant to that agreement, in exchange for certain fees to be paid by Davidson Cotton to Crown Capital, Crown Capital was to provide to Davidson Cotton certain "executive management services, including consultation, advice and direct management assistance * * * with respect to operations, strategic planning, financing and other aspects of the business of" Davidson Cotton.

On certain dates not disclosed by the record, the key employees of Crown Capital (namely, Mr. Lerner, Jason Ackerman, and Mr. Deutschman) and Mr. Ackerman assisted Davidson Cotton in starting a towel manufacturing business in Mexico. The business operations of Davidson Cotton were ultimately unsuccessful, and the company was liquidated. Davidson Cotton was able to pay to Crown Capital only a portion of the fees required by the Davidson Cotton management services agreement.[21]

---

[20]Our detailed findings of fact with respect to Mr. Ackerman's investment in Davidson Cotton are set forth in the attached appendix A, which is incorporated herein.

[21]The record does not disclose what ultimately happened to Mr. Ackerman's investment in Davidson Cotton.

Another major project that Mr. Ackerman pursued involved assisting a company known as Equity Marketing, Inc. (Equity Marketing),[22] in making certain unidentified acquisitions. In early 2000, Equity Marketing, through one of Mr. Ackerman's former colleagues at Drexel, approached Mr. Ackerman and asked him to make an investment in the company and to provide advice with respect to the acquisitions that Equity Marketing was seeking to make. Mr. Ackerman asked Jason Ackerman, Mr. Deutschman, and Mr. Lerner to perform certain due diligence services in order to determine whether Equity Marketing was a company in which Mr. Ackerman should invest.

Sometime before March 22, 2000, Mr. Ackerman decided to invest in Equity Marketing through Somerville, and on that date Mr. Ackerman made that investment (discussed in more detail below). From 2000 to 2008, Mr. Ackerman provided certain advice to Equity Marketing regarding the acquisitions that it was seeking to make.

On March 22, 2000, Somerville formed Crown Acquisition Partners, LLC (Crown Acquisition Partners). On March 29, 2000, Crown Acquisition Partners entered into a securities purchase agreement (Equity Marketing securities purchase agreement) with Equity Marketing. That agreement provided that on March 29, 2000, Equity Marketing was to sell to Crown Acquisition for

_____

[22]Equity Marketing was a marketing/advertising agency located in Los Angeles, Cal.

$11,900,000 (1) certain shares of series A preferred stock in Equity Marketing, (2) certain warrants to purchase certain shares of series B preferred stock in Equity Marketing, and (3) certain warrants to purchase certain shares of series C preferred stock in Equity Marketing. The Equity Marketing securities purchase agreement also provided that "as soon as practicable" Equity Marketing was to sell to Crown Acquisition Partners for $13,100,000 (1) certain additional shares of series A preferred stock in Equity Marketing, (2) certain warrants to purchase certain additional shares of series B preferred stock in Equity Marketing, and (3) certain warrants to purchase certain additional shares of series C preferred stock in Equity Marketing.

As part of its agreement to sell to Crown Acquisition Partners certain shares of stock in Equity Marketing and certain warrants to purchase certain other shares of stock in Equity Marketing, Equity Marketing agreed to pay to Crown Acquisition Partners, or any of its affiliates, including Crown Capital, a total commitment fee of $1,250,000 in 20 quarterly installments of $62,500. As required by the Equity Marketing securities purchase agreement, from June 30, 2000, to March 31, 2005, Equity Marketing paid to Crown Capital that $1,250,000 commitment fee in 20 quarterly installments of $62,500.

On April 28, 2000, Crown Acquisition Partners changed its name to Crown Emak Partners, LLC (Crown Emak Partners). On a

date not disclosed by the record, Somerville contributed its interest in Crown Emak Partners to Crown Emak Investments, LLC (Crown Emak Investments).[23]  As of June 13, 2000, the members of Crown Emak Investments were Somerville, Crown Emak Holdings, LLC (Crown Emak Holdings), and J. Rothschild Nominees (Guernsey) Limited.[24]

Crown Emak Investments issued to Somerville Schedule K-1, Partner's Share of Income, Credits, Deductions, etc. (Schedule K-1), for each of Somerville's taxable years 2000 through 2006. Each of those schedules showed dividend income paid by Equity

---

[23]As of June 13, 2000, the members of Crown Emak Partners were Crown Emak Investments, Allen Ba (Mr. Ba), Chris Calise (Mr. Calise), and Ken Squire (Mr. Squire).  Mr. Ba, Mr. Calise, and Mr. Squire were employed by Crown Capital when they became members of Crown Emak Partners.  Crown Emak Investments, which was the managing member of Crown Emak Partners, owned a 99.31-percent interest in Crown Emak Partners, which it had received in exchange for its contribution to Crown Emak Partners of $24,828,541.

[24]Somerville owned a 79.96-percent interest in Crown Emak Investments, which it had received in exchange for its contribution to Crown Emak Investments of $8,090,000 and its interest in Crown Emak Partners valued at $11,900,000.  Crown Emak Holdings owned a .04-percent interest in Crown Emak Investments, which it had received in exchange for its contribution to Crown Emak Investments of $10,000.  J. Rothschild Nominees (Guernsey) Limited owned the remaining 20-percent interest in Crown Emak Investments, which it had received in exchange for its contribution to Crown Emak Investments of $5 million.

As of July 17, 2003, the members of Crown Emak Holdings were Somerville, Jason Ackerman, Mr. Deutschman, Mr. Lerner, Mr. Squire, Michael Leraris (Mr. Leraris), Suneel Kaji (Mr. Kaji), and J. Rothschild Nominees (Guernsey) Limited.  Jason Ackerman, Mr. Deutschman, Mr. Lerner, Mr. Squire, Mr. Leraris, and Mr. Kaji were employees of Crown Capital when they became members of Crown Emak Holdings.

Marketing to Crown Emak Partners with respect to the preferred stock that Crown Emak Partners had acquired pursuant to the Equity Marketing securities purchase agreement.  That dividend income was the only income reported in the Schedule K-1 that Crown Emak Investments issued to Somerville for each of Somerville's taxable years 2001 through 2004.[25]

Crown Emak Holdings issued to Somerville Schedule K-1 for each of Somerville's taxable years 2000 through 2006.  Each of those schedules showed dividend income paid by Equity Marketing to Crown Emak Partners with respect to the preferred stock that Crown Emak Partners had acquired pursuant to the Equity Marketing securities purchase agreement.[26]

Another major project that Mr. Ackerman pursued involved starting an Internet grocery business.  The initial concept of

---

[25]The respective Schedules K-1 that Crown Emak Investments issued to Somerville for Somerville's taxable years 2001 through 2004 are part of the record.  The respective Schedules K-1 that Crown Emak Investments issued to Somerville for Somerville's taxable years 2000, 2005, and 2006 are not part of the record. Thus, we do not know whether there was any income reported in any of those schedules other than the dividend income paid by Equity Marketing to Crown Emak Partners with respect to the preferred stock that Crown Emak Partners had acquired pursuant to the Equity Marketing securities purchase agreement.

[26]The respective Schedules K-1 that Crown Emak Holdings issued to Somerville for Somerville's taxable years 2000 through 2006 are not part of the record.  Thus, we do not know whether there was any income reported in any of those schedules other than the dividend income paid by Equity Marketing to Crown Emak Partners with respect to the preferred stock that Crown Emak Partners had acquired pursuant to the Equity Marketing securities purchase agreement.

that business originated with Jason Ackerman. Beginning around 1999, Mr. Ackerman, Crown Capital under the leadership of Jason Ackerman, and Joe Fedele, a supermarket executive hired by Mr. Ackerman and Crown Capital, spent approximately two years in creating a business plan for an Internet grocery business. Around 2000, Mr. Ackerman, Crown Capital, and/or Joe Fedele formed Fresh Direct Holdings, Inc. (Fresh Direct), to operate that business.

From the formation of Fresh Direct until early 2006, Mr. Ackerman served as chairman of the board of directors of Fresh Direct. In early 2006, Mr. Ackerman resigned as chairman of that board but continued to serve as a member thereof.[27]

On a date not disclosed by the record, Mr. Ackerman invested in Fresh Direct by purchasing 83 percent of the shares of stock in that corporation for a penny a share. Thereafter, Mr. Ackerman contributed at least certain of those shares to Crown Fresh Direct, LLC (Crown Fresh Direct), that had been formed by Somerville on March 1, 2000.[28]

---

[27]In 2006, Rick Braddock (Mr. Braddock) became the chairman of the board of directors of Fresh Direct. On a date not disclosed by the record before the date on which Mr. Braddock became the chairman of that board, he had invested in, and entered into an agreement to provide certain consulting services to, Fresh Direct.

[28]Our detailed findings of fact with respect to the ownership of Crown Fresh Direct and certain other related entities are set forth in the attached appendix B, which is incorporated herein.

On a date not disclosed by the record before September 2002, C. Gregory Earls (Mr. Earls), a well-known businessman in Washington, D.C., whom Mr. Ackerman had known since 1995 or 1996,[29] informed Mr. Ackerman that he had certain clients that would be interested in investing in Fresh Direct. Thereafter, Mr. Earls and Mr. Ackerman each attempted to raise funds for that corporation. Mr. Ackerman successfully raised a substantial amount of funds for Fresh Direct. Mr. Earls advised Mr. Ackerman to place those funds in an escrow account in the name of Mr. Earls, which Mr. Ackerman did. (We shall refer to the funds that Mr. Ackerman raised for Fresh Direct and placed into that escrow account as the Fresh Direct investor funds in escrow.)

On April 12, 2000, Crown Capital and Fresh Direct entered into a management services agreement (Fresh Direct management services agreement), and on April 29, 2003, they entered into an amended and restated management services agreement (Fresh Direct amended management services agreement). Pursuant to those agreements, Crown Capital was to provide to Fresh Direct

> advisory and consulting services in relation to the affairs of * * * [Fresh Direct] in connection with strategic financial planning, and other services, including, without limitation, advisory and consulting services relating to the selection, supervision and retention of independent auditors, the selection, retention and supervision of outside legal counsel, and the selection, retention and supervision of investment bankers or other financial advisors or consultants.

---

[29]Mr. Ackerman met Mr. Earls when Mr. Ackerman's son was in the same class at Harvard University as Mr. Earls's daughter.

In exchange for the services that Crown Capital provided to Fresh Direct, Fresh Direct paid to Crown Capital the fees required by the Fresh Direct management services agreement and the Fresh Direct amended management services agreement.

During each of the years at issue, Mr. Ackerman, through Somerville S Trust, made payments to Crown Capital of the funds that Crown Capital requested in order to assist it in carrying on its business activities.[30]  The total amount of payments that Mr. Ackerman made to Crown Capital during each of those years was:

| Year | Total Payment |
|------|---------------|
| 1997 | [1]$1,954,632 |
| 1998 | 7,300,000 |
| 2000 | [2]6,687,520 |
| 2002 | [3]2,254,747 |
| 2004 | 1,000,000 |

[1]Of the $1,954,632 that Mr. Ackerman paid to Crown Capital during 1997, $200,000 pertained to a failed attempt to establish an insurance company.
[2]Of the $6,687,520 that Mr. Ackerman paid to Crown Capital during 2000, $1,827,418 pertained to certain unidentified abandoned projects.
[3]Of the $2,254,747 that Mr. Ackerman paid to Crown Capital during 2002, $663,520 pertained to certain unidentified abandoned projects.

The practice that Crown Capital followed in requesting funds from Mr. Ackerman was to send an invoice for the funds requested to Ms. Patriarca, who, as discussed above, handled the bookkeep-

---

[30]The record does not establish how Crown Capital treated for book and tax purposes the payments that Mr. Ackerman made to it during each of the years at issue.

ing for Somerville S Trust.[31]  After obtaining Mr. Ackerman's
approval, Ms. Patriarca had the funds requested sent to Crown
Capital.

During each of petitioners' taxable years 1997, 1998, 2000,
and 2002, Mr. Ackerman made payments to Rockport Advisors of
certain funds that it requested.[32]  The total amount of payments
that Mr. Ackerman paid to Rockport Advisors during each of those
years was:[33]

| Year | Total Payment |
|------|---------------|
| 1997 | $587,500 |
| 1998 | 950,000 |
| 2000 | 1,235,876 |
| 2002 | 500,000 |

During each of the years at issue, Mr. Ackerman did not
provide advisory services with respect to the major projects in

_____

[31]The invoices that Crown Capital sent to Ms. Patriarca are
not part of the record.

[32]The record not establish how Rockport Advisors treated for
book and tax purposes the payments that Mr. Ackerman made to it
during each of petitioners' taxable years 1997, 1998, and 2002.
However, we note that the amount of "Gross receipts or sales"
that Rockport Advisors reported in its Form 1120 for its taxable
year 1998 is equal to the total amount of the payments that Mr.
Ackerman made to Rockport Advisors during that year.  As for
petitioners' taxable year 2000, Rockport Advisors booked the
total amount of the payments that Mr. Ackerman made to it during
that year as "ADVISORY FEE INCOME", and Rockport Advisors re-
ported that amount as "Gross receipts or sales" in its Form 1120
for that year.

[33]The record does not disclose any other information regard-
ing Mr. Ackerman's payments to Rockport Advisors during 1997,
1998, 2000, and 2002.  Nor does the record disclose whether Mr.
Ackerman made any payments to Rockport Advisors during petition-
ers' taxable year 2004.

exchange for a fee or a commission or with the purpose of selling his interests in the respective companies involved in those projects in the ordinary course of any business of his.  Nor did Mr. Ackerman provide advisory services with respect to the major projects during any of those years in exchange for any other compensation other than the normal investor's return.

As discussed above, in petitioners' Schedule C for each of the years at issue, petitioners showed the "Principal business or profession, including product or service" as "INVESTMENTS AND BANKING" and the "Business name" as "PETER ACKERMAN".  Mr. Ackerman maintained no books and records with respect to the activity reflected in each of those schedules.

In the 1997 Schedule C, petitioners reported no income in part I and claimed $2,752,132 as "Other expenses" in part II consisting of payments of (1) $1,954,632 to Crown Capital, (2) $587,500 to Rockport Advisors, and (3) $210,000 to Nevada Media Partners.  In that schedule, petitioners claimed a net loss of $2,752,132.  In determining the taxable income reported in the 1997 joint return, petitioners deducted that net loss.

In the 1998 Schedule C, petitioners reported no income in part I and claimed $8,250,000 as "Other expenses" in part II consisting of payments of (1) $7,300,000 to Crown Capital and (2) $950,000 to Rockport Advisors.  In that schedule, petitioners claimed a net loss of $8,250,000.  In determining the taxable

income reported in the 1998 joint return, petitioners deducted that net loss.

In the 2000 Schedule C, petitioners reported no income in part I and claimed $7,973,649 as "Other expenses" in part II consisting of (1) $50,253 of expenses for a book that Mr. Ackerman had coauthored on nonviolent resistance[34] (Mr. Ackerman's book on nonviolent resistance) and (2) payments of (a) $6,687,520 to Crown Capital and (b) $1,235,876 to Rockport Advisors. In that schedule, petitioners claimed a net loss of $7,973,649. In determining the taxable income reported in the 2000 joint return, petitioners deducted that net loss.

In the 2002 Schedule C, petitioners reported no income in part I and claimed $2,754,747 as "Other expenses" in part II consisting of payments of (1) $2,254,747 to Crown Capital and (2) $500,000 to Rockport Advisors. In that schedule, petitioners reported a net loss of $2,754,747. In determining the taxable income reported in the 2002 joint return, petitioners deducted that net loss.

In the 2004 Schedule C, petitioners reported no income in part I and claimed $1 million as "Other expenses" in part II consisting of a payment of that amount to Crown Capital. In that schedule, petitioners reported a net loss of $1 million. In

---

[34]The $50,253 of expenses pertaining to Mr. Ackerman's book on nonviolent resistance consisted of expenses for certain research and publicity and an unidentified "book purchase".

determining the taxable income reported in the 2004 joint return, petitioners deducted that net loss.

In the notice for 1997, 1998, and 2000 and the notice for 2002 and 2004 (collectively, the notices), respondent determined that (1) the "Other expenses" that petitioners claimed in Schedule C "are not attributable to an active trade or business under IRC Section 162", (2) those expenses are deductible as "expenses related to the production or collection of income under IRC Section 212 subject to the 2 percent floor for miscellaneous deductions", and (3) therefore petitioners should have reported those expenses in Schedule A--Itemized Deductions (Schedule A) instead of Schedule C.[35]

Claimed Deduction for the
Protection of Business Reputation

In 1918, the maternal grandfather of Don Ackerman and of Mr. Ackerman started a business that was the predecessor of ECC. In 1964, the father of Don Ackerman and of Mr. Ackerman incorporated ECC, a supplier of wallpaper sample books and sample cards for paint, rugs, and wood pieces. Around 1965, when the grandfather, the father, and the uncle of Don Ackerman and of Mr. Ackerman

---

[35]With respect to the payment of $210,000 to Nevada Media Partners that petitioners deducted in the 1997 Schedule C, the parties agree that that payment constituted a capital expenditure. They further agree that that $210,000 should not have been deducted in the 1997 Schedule C but should have been included as part of Somerville S Trust's basis in its interest in Santa Monica.

developed certain health problems, Don Ackerman took over the management of ECC.

Funds Advanced to ECC

During the early 1990s, ECC operated a successful business. It generated annual revenue of approximately $25 million and had approximately 1,500 employees. By 1997, at a time when Don Ackerman and Jason Ackerman owned ECC,[36] that company faced dire financial circumstances that were due in large part to a reduced need for wallpaper sample books.

On a date in 1997 not disclosed by the record before May 7, Don Ackerman approached his brother Mr. Ackerman and informed him that ECC was unable to meet its payroll obligations, that ECC and/or Don Ackerman had accrued a substantial amount of bank debt, and that ECC and Don Ackerman might have to commence a bankruptcy proceeding.

Mr. Ackerman, who was not a stockholder, guarantor, employee, or officer of ECC, decided to advance certain funds to ECC. On the dates indicated, Mr. Ackerman, through Somerville S Trust, advanced to ECC the following amounts totaling $7,850,000 ($7,850,000 of advanced funds):[37]

---

[36]The record does not disclose when Don Ackerman and Jason Ackerman acquired their respective stock interests in ECC.

[37]Although Mr. Ackerman advanced a total of $7,850,000 to ECC through Somerville S Trust, in discussing Mr. Ackerman's advancing those funds, we shall sometimes for convenience not
(continued...)

| Date | Amount |
|------|--------|
| 5/7/1997 | $1,000,000 |
| 6/3/1997 | 1,000,000 |
| 7/2/1997 | 1,000,000 |
| 7/30/1997 | 2,400,000 |
| 8/29/1997 | 500,000 |
| 9/26/1997 | 500,000 |
| 10/28/1997 | 600,000 |
| 11/6/1997 | 100,000 |
| 11/21/1997 | 750,000 |

ECC never repaid the funds that Mr. Ackerman advanced to it.

Around the time in 1997 Mr. Ackerman had decided to advance, and was advancing, $7,850,000 to ECC, a decision had been made to form International Service Investors, LLC (ISI), International Service Group, LLC (ISG), and International Service Group Holdings, LLC (ISGH),[38] in order to continue the operations of ECC in modified form.[39]  Around the same time, Mr. Ackerman also decided

---

[37](...continued)
indicate that Mr. Ackerman advanced those funds through Somerville S Trust.

[38]ISI, ISG, and ISGH were formed on the following dates:

| Entity | Date of Formation |
|--------|-------------------|
| ISI | 8/27/1997 |
| ISG | 8/29/1997 |
| ISGH | 11/1/1997 |

[39]The parties generally refer to ISI, ISG, and ISGH as the "International Group".  In describing the activities of the International Group in their stipulation of facts, the parties do not make clear whether each of the three companies making up the International Group engaged in those activities.  It appears from the record that ISG was the only company engaged in manufacturing
(continued...)

to make, and was making, through Somerville an investment of $18,050,000 in the International Group by investing that amount in ISI.[40] Those funds enabled ISI and the other companies making up the International Group to conduct their operations.

As of December 31, 1997, Somerville owned a 98-percent interest, ECC owned a 1-percent interest, and New Cumberland Corporation, Inc. (New Cumberland),[41] owned a 1-percent interest in ISI. In exchange for the 1-percent interest in ISI that ECC owned as of December 31, 1997, ECC contributed all of its assets (discussed below) totaling $15,190,903, but none of its liabilities, to ISI.[42] As of December 31, 1997, ISI owned a 1-percent interest and ISGH, in which ISI owned a 75-percent interest,[43] owned a 99-percent interest in ISG.

---

[39](...continued)
operations. When referring to one or more of the companies making up the group that the parties refer to as the "International Group", we shall sometimes for convenience use the terminology that the parties use.

[40]The record does not disclose the specific date in 1997 on which Somerville invested $18,050,000 in ISI.

[41]At all relevant times, Don Ackerman owned New Cumberland.

[42]As of Dec. 31, 1997, ISI was the sole stockholder of ECC. The record does not disclose how, or the specific date on which, ISI acquired its stock interest in ECC.

[43]As of Dec. 31, 1997, Jason Ackerman and Mr. Deutschman each owned a 7-percent interest, New Cumberland owned a 3.75-percent interest, and Crown Capital owned a 7.25-percent interest in ISGH.

Included in the assets that ECC contributed to ISI were a substantial, but undisclosed, amount of cash, substantial amounts of inventory, certain accounts receivable, certain intangible assets in the form of customer relationships, certain employee relationships, certain leasehold interests, and substantial amounts of machinery and equipment that ECC had used in the production of sample cards and packaging projects. The assets that ECC contributed to ISI assisted the International Group in continuing the operations of ECC in modified form.

After the International Group was formed and received from Mr. Ackerman, through Somerville, over $18 million and from ECC over $15 million of assets, the International Group made certain fundamental changes to ECC's business model and continued ECC's business in modified form. For example, the International Group engaged in the manufacture of Pokemon cards and the business of creating packaging for various companies.

From at least 1998 through 2003, Mr. Deutschman managed the day-to-day business operations of the International Group from the International Group's offices in New Jersey. At all relevant times, the International Group carried out its operations in New Jersey, New York City, Texas, and/or Mexico. In 1999, at least certain of the manufacturing operations of the International Group were moved from New Jersey to Mexico.

Book and Tax Treatment of the $7,850,000 of
Advanced Funds by Somerville and by Santa Monica

At the direction of Mr. Lerner, Somerville S Trust booked the $7,850,000 of advanced funds as a loan from Somerville S Trust to ECC.  Consistent with Somerville S Trust's treatment of the $7,850,000 of advanced funds in its books, ECC booked those funds as a loan from Somerville S Trust to ECC.  In Schedule L, Balance Sheets per Books (Schedule L), of Form 1120 for each of its taxable years ended November 30, 1998 (1998 Schedule L), and November 30, 1999, ECC included the $7,850,000 of advanced funds as part of its "Other liabilities".[44]  In Schedule M-1, Reconciliation of Income (Loss) per Books With Income per Return, of Form 1120 for its taxable year ended November 30, 2000, ECC included the $7,850,000 of advanced funds as book income from the "CANCEL-LATION OF DEBT".

On December 16, 1997, Somerville S Trust contributed to Somerville a loan receivable (contributed loan receivable) with respect to the $7,850,000 of advanced funds.  Somerville S Trust's basis in its interest in Somerville included the value of that loan receivable, and the contributed loan receivable was among the assets held by Somerville when Somerville S Trust contributed its interest in Somerville to Santa Monica on December 29, 1997.

---

[44]In the 1998 Schedule L, ECC incorrectly identified the amount of the ECC funds as $7,750,000, instead of $7,850,000.

In Schedule L of Form 1065 that it prepared, but did not file,[45] for each of its taxable years 1997, 1998, and 1999, Somerville included the contributed loan receivable as part of its "Other current assets". In Form 1065 that it prepared, but did not file, for its taxable year 2000, Somerville claimed an **"Ordinary * * * (loss) from trade or business activities"** of $9,171,171 (Somerville's claimed 2000 ordinary loss). In calculating that loss, Somerville deducted a bad debt of $7,850,000 with respect to the contributed loan receivable.

On July 2, 2001, Santa Monica, which owned all of Somerville, filed Form 1065 for its taxable year 2000. In that form, Santa Monica claimed an **"Ordinary * * * (loss)** from trade or business activities" of $10,344,426 (Santa Monica's claimed 2000 ordinary loss). That ordinary loss that Santa Monica claimed included Somerville's claimed 2000 ordinary loss.[46] Santa Monica's claimed 2000 ordinary loss was allocated as follows: 99.88 percent to Somerville S Trust, .059 percent to Rockport

---

[45]See supra note 7.

[46]The parties stipulated that Santa Monica's claimed 2000 ordinary loss included "an ordinary loss in the amount of $91,171,171 from Somerville LLC." That stipulation is clearly contrary to the facts that we have found are established by the record, and we shall disregard it. See Cal-Maine Foods, Inc. v. Commissioner, 93 T.C. 181, 195 (1989). The record establishes, and we have found, that Santa Monica's claimed 2000 ordinary loss included Somerville's claimed 2000 ordinary loss of only $9,171,171.

Capital, and .059 percent to Perry Lerner.[47]  In Schedule E of their 2000 joint return, petitioners reported Somerville S Trust's and Rockport Capital's respective allocable shares of Santa Monica's claimed 2000 ordinary loss.[48]

On or about August 8, 2005, petitioners and respondent executed Form 872, Consent to Extend the Time to Assess Tax (Form 872), in which they consented to extend to December 31, 2006, the time within which to assess petitioners' tax for their taxable year 2000.  That Form 872 did not provide that it applied to any tax of petitioners attributable to the partnership items of Santa Monica.

Santa Monica did not execute Form 872-P, Consent to Extend the Time to Assess Tax Attributable to Partnership Items, with respect to its taxable year 2000.

In the second amended petition at docket No. 13947-06, petitioners alleged as an affirmative issue that the $7,850,000 of advanced funds is deductible under section 162(a) for peti- tioners' taxable year 1997.

---

[47]Before 2000, Santa Monica, Somerville, and petitioners did not claim any deductions with respect to the $7,850,000 of advanced funds.

[48]The record does not disclose whether Mr. Lerner reported in his tax return for his taxable year 2000 his allocable share of Santa Monica's claimed 2000 ordinary loss.

Claimed Losses With Respect to ISI

From around early 1998 through 2003, Mr. Deutschman, who lived in New York City, had a leadership role in each of the companies (i.e., ISI, ISG, and ISGH) that made up the International Group.[49] During each of those years, Mr. Deutschman spent more than 500 hours managing the day-to-day business operations of the International Group. Mr. Deutschman performed his management activities with respect to the business operations of the International Group from the International Group's offices in New Jersey. No person spent more time managing the business operations of the International Group than Mr. Deutschman.

During at least 1998 and 2000, Don Ackerman and Jason Ackerman also provided certain unidentified management services to the International Group.

Mr. Ackerman, who during the years at issue lived in Washington, D.C., was not an employee or officer of any of the companies that made up the International Group, did not receive any wages from any of those companies, and did not maintain a log documenting the amount of time that he devoted to any of those companies.

During 1998 through 2000, Mr. Ackerman communicated on various occasions with Mr. Deutschman regarding various matters,

---

[49]For example, from 1998 through 2003, Mr. Deutschman served as president of ISI.

including the business operations and finances of the International Group and various other investments of Mr. Ackerman. Mr. Deutschman sent Mr. Ackerman at least one memorandum dated July 9, 1999, regarding the business operations of the International Group that served as a basis for discussions between the two of them.

During 1998 through 2000, Mr. Ackerman spent at least one or two days in certain weeks in New York City. During that period, he also visited New Jersey where his mother and his brother Don Ackerman lived. While in New York City, Mr. Ackerman spent time on various matters, including matters relating to certain of the major projects in which Crown Capital was involved and certain charitable activities relating to CARE. While in New Jersey, Mr. Ackerman, inter alia, occasionally visited Mr. Deutschman where Mr. Deutschman managed the operations of the International Group.

ISI issued to Somerville Schedule K-1 with respect to each of Somerville's taxable years 1998 (1998 ISI Schedule K-1 issued to Somerville) and 2000 (2000 ISI Schedule K-1 issued to Somerville). In the 1998 ISI Schedule K-1 issued to Somerville, ISI showed an "Ordinary * * * (loss) from trade or business activities" of $6,983,996 (1998 ISI loss). In the 2000 ISI Schedule K-1 issued to Somerville, ISI showed an "Ordinary * * * (loss) from trade or business activities" of $1,771,427 (2000 ISI loss).

In the 1998 joint return and the 2000 joint return, petitioners treated Mr. Ackerman's allocable portions of the respective 1998 ISI loss and 2000 ISI loss as passive activity losses. In the second amended petition at docket No. 13947-06, petitioners alleged as an affirmative issue that the "losses deducted by Petitioners as passive losses [with respect to ISI] should be allowed as active because Mr. Ackerman materially participated in this business activity throughout the years of the deductions."

Claimed Theft Loss Deduction

Around 1996 or 1997, Mr. Earls approached Mr. Ackerman with a proposal to invest in U.S. Technologies, Inc. (U.S. Technologies), a publicly traded Delaware corporation that used prison labor to manufacture a variety of products.  Mr. Ackerman believed that such an investment would be profitable.

On June 22, 1998, USV Partners, LLC (USV), was formed for the purpose of acquiring and holding shares of preferred and common stock of U.S. Technologies.  At all relevant times, Mr. Earls was the sole director, officer, and employee of USV and controlled all of its funds.

Pursuant to various subscription agreements, from July 10, 1998, through August 27, 2001, Mr. Ackerman, through Somerville S Trust, invested funds totaling $4,467,610 in USV.  Pursuant to those agreements, those invested funds were to be used by USV to purchase shares of common and/or preferred stock in U.S. Technol-

ogies.[50]  On March 4, 2002, USV distributed to Somerville S Trust 18,759,879 shares of common stock in U.S. Technologies.

Around September 2002, Mr. Ackerman asked Mr. Earls to return to him the Fresh Direct investor funds in escrow (discussed above).  Mr. Earls was unable to do so because he had removed from escrow at least certain of those funds.  Mr. Ackerman gave Mr. Earls a deadline by which he had to return to him the full amount of the Fresh Direct investor funds in escrow.  Mr. Earls borrowed a certain amount of money and returned to Mr. Ackerman the full amount of those funds by the deadline that Mr. Ackerman set.

When Mr. Ackerman learned that Mr. Earls had removed from escrow certain of the Fresh Direct investor funds in escrow, Mr. Ackerman began to question whether Mr. Earls had properly handled the funds that Mr. Ackerman, through Somerville S Trust, had invested in USV.  On a date not disclosed by the record before December 9, 2002, Mr. Ackerman learned that Mr. Earls had used for his own personal benefit certain of the funds that Mr. Ackerman, through Somerville S Trust, and other members of USV had invested in USV.  Shortly thereafter, Mr. Ackerman informed a

---

[50]On a date not disclosed by the record, Mr. Lerner also invested certain funds in USV.  Like the funds that Mr. Ackerman, through Somerville S Trust, invested in USV, the funds that Mr. Lerner invested in USV were to be used by USV to purchase shares of common and/or preferred stock in U.S. Technologies.

district attorney in New York[51] of Mr. Earls's conduct with respect to those funds.

On December 9, 2002, in an effort to recover damages of approximately $5,953,000, Somerville S Trust and certain other persons who owned interests in USV filed a complaint (December 9, 2002 complaint) in the United States District Court for the District of Maryland (U.S. District Court for Maryland) against David Ferreira (Mr. Ferreira) and Ferreira & Isbell, LLC (Ferreira & Isbell). (We shall refer to that civil action as the Ferreira litigation.) In the December 9, 2002 complaint, the plaintiffs in the Ferreira litigation alleged, inter alia, that the defendants identified in that complaint had "negligently and recklessly failed to exercise due care in performing their review of USV's general ledgers and trial balances, in making any adjustments thereto, and in performing other accounting services for USV."

On December 18, 2002, criminal complaints were filed against Mr. Earls in the United States District Court for the Southern District of New York. Thereafter, on March 24, 2003, Mr. Earls, who was accused of stealing $13 million of $20 million that had been invested in USV, was indicted in that court on one count of

---

[51]The record does not disclose which district attorney's office in New York Mr. Ackerman informed of Mr. Earls's conduct with respect to the funds that Mr. Ackerman, through Somerville S Trust, and other members of USV had invested in USV.

securities fraud, 19 counts of wire fraud, and two counts of mail fraud.

On June 17, 2003, Mr. Ackerman executed a formal engagement letter for representation by the law firm of Jenner & Block, LLC (Jenner & Block), in connection with the Ferreira litigation and certain other litigation against Mr. Earls in the Superior Court of the District of Columbia.

On August 19, 2003, Somerville S Trust entered into three respective securities and purchase agreements with (1) Mr. Lerner, (2) WS Investments, LP (WS Investments), and (3) certain family trusts that were established for the benefit of certain members of Mr. Ackerman's family (Ackerman family trusts).[52] Pursuant to the securities and purchase agreement entered into by Somerville S Trust and Mr. Lerner, that trust was to acquire from Mr. Lerner for a total purchase price of $150,000 (1) any membership interests in USV and shares of stock in U.S. Technologies that Mr. Lerner owned and (2) any claims that Mr. Lerner had against Mr. Earls or any of Mr. Earls's affiliates with respect to any fraudulent conduct of Mr. Earls concerning those membership interests and shares of stock. Pursuant to the securities and purchase agreement entered into by Somerville S Trust and WS

---

[52]On a date not disclosed by the record before Mr. Ackerman's discovery of Mr. Earls's conduct with respect to the funds invested in USV, Somerville S Trust had transferred as gifts small portions of its USV membership interest to the Ackerman family trusts.

Investments, that trust was to acquire from WS Investments for a total purchase price of $200,000 (1) any membership interests in USV and shares of stock in U.S. Technologies that WS Investments owned and (2) any claims that WS Investments had against Mr. Earls or any of Mr. Earls's affiliates with respect to any fraudulent conduct of Mr. Earls concerning those membership interests and shares of stock. Pursuant to the securities and purchase agreement entered into by Somerville S Trust and the Ackerman family trusts, Somerville S Trust was to acquire from those family trusts for a total purchase price of $50,000 (1) any membership interests in USV and shares of stock in U.S. Technologies that the Ackerman family trusts owned and (2) any claims that the Ackerman family trusts had against Mr. Earls or any of Mr. Earls's affiliates with respect to any fraudulent conduct of Mr. Earls concerning those membership interests and shares of stock.

On August 21, 2003, in an effort to recover damages of at least $5,952,860, Somerville S Trust, which was represented by Jenner & Block, filed a complaint (August 21, 2003 complaint) in the United States District Court for the District of Columbia (U.S. District Court for the District of Columbia) against, inter alia, Mr. Earls, USV Partners, and U.S. Technologies. The claims set forth in the August 21, 2003 complaint included the claims that were assigned to Somerville S Trust by Mr. Lerner, WS In-

vestments, and the Ackerman family trusts pursuant to the respective securities and purchase agreements described above. Somerville S Trust alleged in that complaint, inter alia, that Mr. Earls had "devised and implemented a fraudulent investment scheme by which he embezzled and misappropriated funds from investors for his own personal benefit."

On November 26, 2003, the parties involved in the Ferreira litigation filed a stipulation of dismissal in the U.S. District Court for Maryland.

By letter dated March 19, 2004, Jenner & Block sent Mr. Ackerman a check in the amount of $1,882.73, which had been recovered from a personal bank account of Mr. Earls. In that letter, Jenner & Block advised Mr. Ackerman that "We have recently served additional subpoenas and attachment orders on various banks where Earls had or has accounts".

On April 23, 2004, Mr. Earls was convicted on all 22 counts on which he had been indicted on March 24, 2003, and was sentenced to prison for ten years.

By letter dated January 11, 2005, Jenner & Block sent Mr. Ackerman a check in the amount of $772.86, which had been recovered from another personal bank account of Mr. Earls. In that letter, Jenner & Block advised Mr. Ackerman of the difficulties and prohibitive costs of recovering any more funds from that account.

On a date not disclosed by the record, Somerville S Trust received a memorandum dated February 14, 2005, that had been sent to the common shareholders of U.S. Technologies by an individual named Adam Joseph (Mr. Joseph).[53]  Mr. Joseph concluded in that memorandum:  "Given the outstanding liabilities of the company and the illiquid state of the remaining investment portfolio, I am not optimistic that * * * [U.S. Technologies] shareholders will realize value."

On May 26, 2005, Somerville S Trust filed a motion to dismiss the August 21, 2003 complaint against Mr. Earls, USV Partners, and U.S. Technologies.[54]  On June 6, 2005, the U.S. District Court for the District of Columbia granted that motion.

From around 2002 through 2005, petitioners paid more than $2.2 million in legal and investigative fees pursuing recovery of any losses sustained as a result of any fraudulent conduct of Mr. Earls with respect to the funds invested in USV.

In the 2002 joint return, petitioners claimed a long-term capital loss of $4,467,610 with respect to the funds that Mr. Ackerman, through Somerville S Trust, invested in USV.  In the

---

[53]The record does not disclose any other information regarding Mr. Joseph.

[54]As discussed above, Somerville S Trust alleged in the August 21, 2003 complaint, inter alia, that Mr. Earls had "devised and implemented a fraudulent investment scheme by which he embezzled and misappropriated funds from investors for his own personal benefit."

2004 joint return, petitioners again claimed a long-term capital loss in the same amount with respect to that investment.

In the notice for 2002 and 2004, respondent did not make any determinations regarding the long-term capital loss of $4,467,610 that petitioners claimed in both the 2002 joint return and the 2004 joint return with respect to the funds that Mr. Ackerman, through Somerville S Trust, invested in USV. In the amended petition at docket No. 26400-06, petitioners acknowledged that they are not entitled to deduct that long-term capital loss for both of their taxable years 2002 and 2004. In that amended petition, petitioners further alleged as an affirmative issue that the long-term capital loss that they claimed in both the 2002 joint return and the 2004 joint return with respect to the funds that Mr. Ackerman, through Somerville S Trust, invested in USV is "deductible as a theft loss" for their taxable year 2002.

Accuracy-Related Penalty Under Section 6662(a)

Joseph Miller (Mr. Miller) prepared petitioners' joint return for each of the years at issue. Ms. Patriarca was responsible for sending to Mr. Miller certain records and schedules that were pertinent to the preparation of each of those returns.

Grant Thornton, LLP (Grant Thornton), prepared the respective tax returns of Somerville, Santa Monica, and Crown Capital for each of the years at issue.

In February 2001, respondent began an examination of petitioners' taxable years 1997, 1998, and 2000 (examination of 1997, 1998, and 2000). The only issue involved in that examination was whether the "Other expenses" that petitioners claimed in Schedule C for each of their taxable years 1997, 1998, and 2000 should have been claimed in Schedule A instead of Schedule C.

Howard Levinton (Mr. Levinton), an accountant who has been employed by Grant Thornton since 1987, represented petitioners with respect to the examination of their taxable years 1997, 1998, and 2000. Mr. Levinton presented to respondent's revenue agent (revenue agent) who was assigned to that examination certain information that that agent requested.

During the examination of 1997, 1998, and 2000, Mr. Levinton also presented to the revenue agent an amended joint return for petitioners' taxable year 1999 (1999 amended joint return). In that amended return, petitioners claimed a refund of $1,857,106. Petitioners included Schedule C as part of the 1999 amended joint return (1999 Schedule C). In that schedule, petitioners showed the "Principal business or profession, including product or service" as "INVESTMENTS AND BANKING" and the "Business name" as "PETER ACKERMAN". In the 1999 Schedule C, petitioners made no entries in the section entitled "**Income**" and claimed "Other expenses" of $9,694,269 consisting of "INVESTMENT ADVISORY FEES" of that amount. Petitioners explained in the 1999 amended joint

return that "TAXPAYERS INCORRECTLY DEDUCTED INVESTMENT ADVISORY FEES AS AN ITEMIZED DEDUCTION RATHER THAN DEDUCTING THEM AS A TRADE OR BUSINESS EXPENSE ON SCHEDULE C."[55]

Around September 2002, respondent issued to petitioners a 30-day letter with respect to their taxable years 1997, 1998, and 2000 (respondent's 30-day letter). In October 2002, Mr. Levinton, on petitioners' behalf, appealed to respondent's Appeals Office (Appeals Office) the adjustments proposed in that letter (petitioners' appeal). Mr. Levinton continued to represent petitioners throughout that appeal process.

Around early 2005, over a year after petitioners filed the 2002 joint return on November 21, 2003, Mr. Levinton informed Mr. Lerner of respondent's position with respect to petitioners' claimed Schedule C expenses for 1997, 1998, and 2000. Sometime thereafter in 2005, Mr. Levinton asked Mr. Lerner to accompany Mr. Levinton to a conference with the Appeals Office (Appeals Office conference) regarding the adjustments proposed in respondent's 30-day letter with respect to those years.[56]

---

[55]In view of respondent's position on the claimed Schedule C deductions that are at issue in these cases, we presume that respondent did not approve the refund that petitioners claimed in the 1999 amended joint return.

[56]The Appeals Office conference that Mr. Levinton asked Mr. Lerner to attend was rescheduled from a date in 2005 not disclosed by the record to a date in December 2005 not disclosed by the record.

Mr. Ackerman had discussions with Mr. Levinton and Mr. Lerner regarding the propriety of petitioners' claimed Schedule C deductions. Mr. Ackerman had those discussions (1) with Mr. Levinton on a date not disclosed by the record after respondent began the examination of 1997, 1998, and 2000 but before petitioners filed the 2002 joint return and (2) with Mr. Lerner[57] on a date in 2005 not disclosed by the record after Mr. Levinton informed him about respondent's position with respect to petitioners' claimed Schedule C deductions for 1997, 1998, and 2000 and over a year after petitioners filed the 2002 joint return.

When Mr. Ackerman discussed the propriety of petitioners' claimed Schedule C deductions with Mr. Levinton and Mr. Lerner, he informed them that the expenses for which petitioners claimed those deductions were "for my business" and "Basically to create business, to create revenue". Based upon what Mr. Ackerman told them, Mr. Levinton and Mr. Lerner advised Mr. Ackerman that they believed that petitioners' claimed Schedule C deductions were proper.

In December 2005, the Appeals Office held the Appeals Office conference with Mr. Levinton and Mr. Lerner regarding the adjust-

---

[57]It is not clear from the record whether Mr. Levinton was present at the discussions that Mr. Ackerman had with Mr. Lerner regarding the propriety of petitioners' claimed Schedule C deductions.

ments proposed in respondent's 30-day letter with respect to petitioners' taxable years 1997, 1998, and 2000.

At a time not disclosed by the record before November 17, 2006, respondent began an examination of petitioners' taxable years 2002 and 2004. Neither Mr. Levinton nor Mr. Lerner was involved in that examination.

As discussed above, in the notice for 1997, 1998, and 2000 and the notice for 2002 and 2004, respondent determined (1) that petitioners' claimed Schedule C expenses "are not attributable to an active trade or business under IRC Section 162", (2) that those expenses are deductible under section 212 subject to the 2-percent floor imposed by section 67(a), and (3) that therefore petitioners should have reported those expenses in Schedule A instead of Schedule C. In the notice for 2002 and 2004, respondent also determined that petitioners are liable for each of their taxable years 2002 and 2004 for the accuracy-related penalty under section 6662(a).[58] The respective accuracy-related penalties under section 6662(a) that respondent determined for petitioners' taxable years 2002 and 2004 are imposed on respective underpayments for those years that are attributable solely to respondent's disallowance of petitioners' respective Schedule

---

[58]In the notice for 1997, 1998, and 2000, respondent did not determine that petitioners are liable for the accuracy-related penalty under sec. 6662(a).

C deductions claimed in the 2002 joint return and the 2004 joint return.

## OPINION

Burden of Proof

Petitioners do not dispute that they bear the burden of proof with respect to (1) the affirmative issues that they raised in the pleadings and that remain at issue and (2) the determinations in the notice for 2002 and 2004 to impose the accuracy-related penalty. Nor do petitioners dispute that they bear the burden of proof with respect to the determinations in the notices to disallow their claimed Schedule C deductions. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Petitioners argue, however, that the burden of proof with respect to the determinations to disallow those claimed deductions shifts to respondent under section 7491(a).

In order for the burden of proof to shift to the Commissioner of Internal Revenue under section 7491(a), the taxpayer must (1) provide credible evidence with respect to any factual issue relevant to determining the tax liability of the taxpayer and (2) comply with the applicable requirements of section 7491(a)(2). Although section 7491(a) does not define the term "credible evidence", the legislative history of the statute does. The legislative history of section 7491(a) states in pertinent part:

Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness). * * * The introduction of evidence will not meet this standard if the court is not convinced that it is worthy of belief. * * *

H. Conf. Rept. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995.

In support of their argument that the burden of proof shifts to respondent under section 7491(a) with respect to the determinations in the notices to disallow their claimed Schedule C deductions, petitioners assert:

The extensive testimony of Mr. Ackerman and others about his Schedule C activity certainly constitutes "credible evidence" with respect to all pertinent factual issues. No expense was challenged for lack of substantiation or failure to maintain records. * * * Accordingly, the burden of proof on this issue should shift to respondent. * * *

Respondent counters that

Petitioners rely heavily on the testimony of petitioner and related individuals, much of which was overly broad, vague, misleading, and uncorroborated by any documentary evidence. This testimony does not constitute credible evidence under section 7491(a)(1). * * * Furthermore, section 7491(a)(2) specifies certain requirements that must be met before section 7491(a)(1) can apply. Specifically, the taxpayer must have maintained all records required by the Internal Revenue Code. I.R.C. § 7491(a)(2)(B). * * * Petitioner did not maintain any books or records with respect to his Schedule C activity. * * *

As discussed below, there are material factual issues relevant to determining whether petitioners are entitled under sec-

tion 162(a) to their claimed Schedule C deductions as to which they have not introduced credible evidence within the meaning of section 7491(a)(1).[59]

On the record before us, we find that the burden of proof does not shift to respondent under section 7491(a) with respect to any factual issues that pertain to the Schedule C deductions that petitioners are claiming for each of the years at issue.

Evaluation of Evidence on Which Petitioners Rely

Petitioners rely on certain testimonial evidence and certain documentary evidence in order to satisfy their burden of proof with respect to each of the issues presented.

Testimonial Evidence

The testimonial evidence on which petitioners rely is the respective testimonies of Mr. Ackerman, Mr. Lerner, Jason Ackerman, Don Ackerman, Mr. Deutschman, Mr. Levinton, Mr. Braddock, and Ms. Patriarca.

---

[59]Assuming arguendo that petitioners had introduced credible evidence within the meaning of sec. 7491(a)(1) with respect to the factual issues relevant to determining whether petitioners are entitled under sec. 162(a) to their claimed Schedule C deductions, the burden of proof with respect to that issue nonetheless would not shift to respondent under sec. 7491(a)(1). That is because we have found that Mr. Ackerman maintained no books and records with respect to the activity reflected in petitioners' Schedule C for each of the years at issue. See sec. 7491(a)(2)(B).

### Mr. Ackerman's Testimony

We found the testimony of Mr. Ackerman to be in certain material respects general, conclusory, vague, ambiguous, confusing, questionable, self-serving, and/or evasive. We shall not rely on Mr. Ackerman's testimony to establish petitioners' respective positions on the various issues to which that testimony pertained.

### Mr. Lerner's Testimony

We found the testimony of Mr. Lerner to be in certain material respects vague, ambiguous, questionable, and/or serving the interests of his longtime associate Mr. Ackerman, who retained Mr. Lerner to provide certain legal services for him and who played a significant role in enabling Mr. Lerner to be employed by Crown Capital. We shall not rely on Mr. Lerner's testimony to establish petitioners' respective positions on the various issues to which that testimony pertained.

### Don Ackerman's Testimony

We found the testimony of Don Ackerman to be in certain material respects general, conclusory, vague, ambiguous, questionable, and/or serving the interests of his brother Mr. Ackerman, who played a significant role in enabling Don Ackerman to be employed by Crown Capital after the business of ECC that Don Ackerman was managing began facing dire financial circum-

stances.[60]  We shall not rely on Don Ackerman's testimony to establish petitioners' respective positions on the various issues to which that testimony pertained.

### Jason Ackerman's Testimony

We found the testimony of Jason Ackerman to be in certain material respects vague, ambiguous, questionable, and/or serving the interests of his uncle and longtime associate Mr. Ackerman, who played a significant role in enabling Jason Ackerman to be employed by Crown Capital.  We shall not rely on Jason Ackerman's testimony to establish petitioners' respective positions on the various issues to which that testimony pertained.

### Mr. Deutschman's Testimony

We found the testimony of Mr. Deutschman to be in certain material respects vague, ambiguous, questionable, and/or serving the interests of his longtime associate Mr. Ackerman, who played a significant role in enabling Mr. Deutschman to be employed by Crown Capital.  We shall not rely on that testimony to establish petitioners' respective positions on the various issues to which that testimony pertained.

### Ms. Patriarca's Testimony

We generally found the testimony of Ms. Patriarca to be credible.  However, that testimony, together with other reliable

---

[60]See _supra_ note 12.

evidence in the record, did not enable us to sustain petitioners' position on any of the issues to which that testimony pertained.

### Mr. Braddock's Testimony

We generally found the testimony of Mr. Braddock to be credible.  However, that testimony, together with other reliable evidence in the record, did not enable us to sustain petitioners' position on the issue to which that testimony pertained.

### Mr. Levinton's Testimony

We found the testimony of Mr. Levinton to be questionable in certain material respects.  We shall not rely on Mr. Levinton's testimony to establish petitioners' respective positions on the various issues to which that testimony pertained.

### Documentary Evidence

The documentary evidence on which petitioners rely includes, inter alia, the notices, the respective tax returns of petition- ers and certain entities that petitioners directly or indirectly owned, certain written agreements,[61] certain travel itineraries of Mr. Ackerman, and certain newspaper articles regarding Mr. Earls. Although the documentary evidence on which petitioners rely is voluminous, that documentary evidence, together with the reliable

---

[61]The written agreements on which petitioners rely include, inter alia, the Equity Marketing securities purchase agreement and certain management service agreements entered into between Crown Capital and each of certain corporations in which Mr. Ackerman invested.

testimonial evidence in the record, did not enable us to sustain

petitioners' position on any of the issues presented.

Claimed Business Expense Deductions

It is petitioners' position that the claimed Schedule C

expenses that remain at issue are deductible under section

162(a).[62]  In support of that position, petitioners argue that Mr.

Ackerman incurred those expenses in carrying on the business of

advising companies about their finances and management.[63]

It is respondent's position that the claimed Schedule C

expenses that remain at issue are deductible under section 212(1)

and that therefore those expenses are subject to the 2-percent

floor imposed by section 67(a).  In support of that position,

respondent argues that Mr. Ackerman incurred the claimed Schedule

---

[62]Virtually all of the expenses that petitioners claimed in Schedule C for each of their taxable years 1997, 1998, 2000, 2002, and 2004 and that remain at issue, see supra note 35, consist of payments that Mr. Ackerman made during each of those years to Rockport Advisors and/or Crown Capital.  The only expenses that remain at issue and that do not consist of payments to Rockport Advisors and/or Crown Capital are $50,253 of expenses for Mr. Ackerman's book on nonviolent resistance that petitioners claimed in the 2000 Schedule C.  See supra note 34.  The parties agree, and we have found, that petitioners paid $50,253 of expenses for that book.  However, petitioners make no argument as to why they are entitled for their taxable year 2000 to deduct those expenses under sec. 162(a).  We conclude that petitioners have abandoned that argument.

[63]For convenience, we shall sometimes refer to Mr. Ackerman's claimed business of advising companies about their finances and management as the alleged business of providing advisory services.

C expenses that remain at issue as an investor and not in carrying on a trade or business within the meaning of section 162(a).

Section 162(a) generally allows a deduction for ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Section 212(1) allows an individual a deduction for ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income.

In support of their claim that during each of the years at issue Mr. Ackerman was engaged in the business of advising companies about their finances and management, petitioners presented evidence with respect to the major projects[64] and advance what we understand to be two arguments.[65] We address each of those arguments below.

Petitioners' Cost Company or Agency Argument

As we understand it, petitioners are arguing that during each of the years at issue Rockport Advisors and/or Crown Capital were cost companies and/or agents of Mr. Ackerman. Consequently,

---

[64]See supra note 15. The record does not disclose what portion of petitioners' claimed Schedule C deductions for each of the years at issue that remains at issue pertained to the major projects.

[65]We found petitioners' arguments on brief in support of their position that during each of the years at issue Mr. Ackerman was engaged in the business of providing advisory services and that therefore the claimed Schedule C expenses are deductible under sec. 162(a) to be confusing. We state our understanding of those arguments.

according to petitioners, they are entitled for each of the years at issue to deduct under section 162(a) the respective payments that Mr. Ackerman made during each of those years to Rockport Advisors and/or Crown Capital. It is not clear from petitioners' briefs whether petitioners are arguing (1) that during each of the years at issue Rockport Advisors and/or Crown Capital were cost companies of Mr. Ackerman and that therefore those companies were his agents or (2) that during each of those years Rockport Advisors and/or Crown Capital were Mr. Ackerman's agents regardless of whether they were cost companies of Mr. Ackerman. On the record before us, we reject both arguments.

We turn first to whether, as petitioners appear to be arguing, Rockport Advisors and/or Crown Capital were cost companies of Mr. Ackerman and that therefore those companies were his agents during each of the years at issue. In support of that argument, petitioners rely on Revenue Ruling 56-542, 1956-2 C.B. 327 (Revenue Ruling 56-542). In that ruling, the Internal Revenue Service (Service) concluded that the stockholders of a captive mining company (mining company) that had been established as a cost company were entitled to certain depletion deductions under section 611 of the Internal Revenue Code of 1954.

In Revenue Ruling 77-1, 1977-1 C.B. 161 (Revenue Ruling 77-1), the Service revoked Revenue Ruling 56-542. As a result, petitioners' reliance on Revenue Ruling 56-542 is misplaced. In

Revenue Ruling 77-1, the Service concluded that "all corporations operating as cost companies" within the meaning of Revenue Ruling 56-542 "will be treated as separate taxpayers and will be required to compute their own income, deductions, credits and tax liabilities."  Rev. Rul. 77-1, 1977-1 C.B. at 161.

Even if the Service had not revoked Revenue Ruling 56-542 in Revenue Ruling 77-1, we nonetheless would, and do, conclude that petitioners' reliance on Revenue Ruling 56-542 is misplaced. That is because the facts that we have found on the record before us are materially distinguishable from the facts involved in Revenue Ruling 56-542.  Revenue Ruling 56-542 described the facts involved therein as follows:

> Certain manufacturing corporations, which require for their normal operations several grades and several kinds of ore, unite and join with other manufacturers in an arrangement for the acquisition, by fee or lease, of mining property and for the exploration, development and operation of such property.  The manufacturers organize a corporation to own and operate the property, subscribe to the corporation's capital stock, and advance all funds needed both for capital and operative purposes.  The mining company, referred to as a 'cost company,' executes a contract with its stockholding manufacturing corporations.  The contract provides essentially that the participants, each in proportion to its stock ownership, shall advance all funds, both capital and operative, necessary for the mining company to operate and shall share in the same proportion in the ore produced.  Under an agreement signed with its stockholding manufacturing corporations, the mining company will not sell any ore and will have no net income.  Its operations, as well as the disposition of the products mined, will at all times be under the control of the participants.

Thus, the basic issue for consideration is whether the economic interest in the ore thus being produced, with the resultant right to claim depletion, is in the captive mining company or its stockholding corporations.

Rev. Rul. 56-542, 1956-2 C.B. at 327.

In concluding in Revenue Ruling 56-542 that the stockholders of the mining company involved therein were entitled to certain depletion deductions under section 611 of the Internal Revenue Code of 1954, the Service indicated that the mining company must "file a corporate return showing no income and no deductions on its face, but containing schedules showing the gross income and deductions allocable" to its stockholders.

Although during each of the years at issue Mr. Ackerman made certain payments to Rockport Advisors and/or Crown Capital, Mr. Ackerman was not a stockholder of those entities. Moreover, Rockport Advisors and Crown Capital did not file tax returns as cost companies described in Revenue Ruling 56-542 in which they claimed no income and no deductions. Instead, (1) Rockport Advisors filed Form 1120 for each of its taxable years 1997, 1998, and 2000[66] in which it reported income and deductions that were attributable to its business activities, and (2) Crown Capital filed Form 1120 for its taxable year 1997 and Form 1120S

_____

[66]See supra note 10.

for each of its taxable years 1998 and 2000[67] in which it reported

income and deductions that were attributable to its business

activities.[68]

On the record before us, we find that petitioners have

failed to carry their burden of establishing that during each of

the years at issue Rockport Advisors and/or Crown Capital were

cost companies of Mr. Ackerman.

We turn now to whether, as petitioners appear to be arguing,

Rockport Advisors and/or Crown Capital were Mr. Ackerman's agents

during each of the years at issue regardless of whether they were

cost companies of Mr. Ackerman. Petitioners state: "A taxpayer

may deduct payments for business expenses made by * * * his agent

on his behalf."[69] In support of that statement, petitioners cite,

---

[67]See supra note 13.

[68]Petitioners also rely on Kenco Rests., Inc. v. Commissioner, T.C. Memo. 1998-342, affd. 206 F.3d 588 (6th Cir. 2000), for the proposition that the "concept of centralizing costs for several projects in one entity still exists." Petitioners' reliance on that case is misplaced. Unlike the instant case, Kenco Rests., Inc. involved the reallocation under sec. 482 of deductions claimed by commonly controlled corporations, one of which had been established as a "cost company" that provided management and administrative support services to the remaining commonly controlled corporations there involved. Moreover, the "cost company" involved in Kenco Rests., Inc. is materially distinguishable from the cost company described in Rev. Rul. 56-542, 1956-2 C.B. 327.

[69]However, in these cases petitioners did not claim as Schedule C deductions the respective expenses that Rockport Advisors and/or Crown Capital incurred during each of the years at issue. Instead, petitioners claimed as Schedule C deductions
(continued...)

inter alia, Commissioner v. Bollinger, 485 U.S. 340 (1988), in which the Supreme Court of the United States (Supreme Court) discussed and applied the four indicia and two requirements of corporate agency (discussed below).[70]  Although petitioners cite Bollinger, they do not analyze and apply those indicia and requirements to Rockport Advisors and to Crown Capital.[71]

Before turning to Commissioner v. Bollinger, supra, we shall consider Natl. Carbide Corp. v. Commissioner, 336 U.S. 422 (1949), the seminal case of the Supreme Court addressing how to determine the existence of a corporate agency.  In addressing

---

[69](...continued)
in the joint return for each of the years at issue certain payments that Mr. Ackerman made during each of those years to Rockport Advisors and/or Crown Capital, and Rockport Advisors and/or Crown Capital claimed as deductions in their respective tax returns the respective expenses that they incurred during each of those years.

[70]In support of their statement that "A taxpayer may deduct payments for business expenses made by * * * his agent on his behalf", petitioners also cite, inter alia, N.Y. Guandong Fin., Inc. v. Commissioner, T.C. Memo. 2008-62.  In that case, we discussed and applied the four indicia and two requirements of corporate agency that the Supreme Court discussed and applied in Commissioner v. Bollinger, 485 U.S. 340, 346-347 (1988).  We concluded in N.Y. Guandong Fin., Inc., that the facts therein did not establish the existence of a corporate agency.

[71]In advancing what appears to be petitioners' argument that Rockport Advisors and/or Crown Capital were cost companies of Mr. Ackerman and that therefore those companies were his agents during each of the years at issue, petitioners claim that "Crown [Capital] operated for the account of Mr. Ackerman".  If the record had established that "Crown [Capital] operated for the account of Mr. Ackerman", which we find it does not, as discussed below, that alleged fact would have been an indicium of agency.

that issue, the Supreme Court set forth the following four indicia and two requirements that are to be considered in making such a determination:

> Whether the corporation operates in the name and for the account of the principal, binds the principal by its actions, transmits money received to the principal, and whether receipt of income is attributable to the services of employees of the principal and to assets belonging to the principal are some of the relevant considerations in determining whether a true agency exists. If the corporation is a true agent, its relations with its principal must not be dependent upon the fact that it is owned by the principal, if such is the case. Its business purpose must be the carrying on of the normal duties of an agent. * * * [Fn. refs. omitted.]

Id. at 437. (The above-quoted indicia and requirements of corporate agency are commonly referred to, and we shall refer to them, as the six National Carbide factors.) In Natl. Carbide Corp., the Supreme Court applied the six National Carbide factors and concluded that the facts therein did not establish the existence of a corporate agency.

In Commissioner v. Bollinger, supra, the Supreme Court again addressed how to determine whether a corporate agency exists. In addressing that issue, the Supreme Court restated the six National Carbide factors, id. at 346-347, and observed that those factors are designed to ensure "the genuineness of the agency relationship", id. at 349. According to the Supreme Court,

> the genuineness of the agency relationship is adequately assured * * * when the fact that the corporation is acting as agent for its shareholders with respect to a particular asset is set forth in a written

agreement at the time the asset is acquired, the corpo-
ration functions as agent and not principal with re-
spect to the asset for all purposes, and the corpora-
tion is held out as the agent and not principal in all
dealings with third parties relating to the asset.
* * *

Id. at 349-350.  In Bollinger, the Supreme Court concluded that
the facts therein established "the genuineness of the agency
relationship".  Id.

In order to determine whether Rockport Advisors and/or Crown
Capital were Mr. Ackerman's agents during each of the years at
issue, we shall apply and analyze the six National Carbide fac-
tors.  We turn first to Rockport Advisors.  As discussed above,
the record is very sparse as to the activities of Rockport Advi-
sors during each of the years at issue,[72] including 1997, 1998,
2000, and 2002, the only years in which Mr. Ackerman made certain
payments to that company that petitioners claimed as expenses in
their respective Schedules C for those years.[73]  We note initially
that the requirement included as one of the six National Carbide
factors that the corporation's "relations with its principal must
not be dependent upon the fact that it is owned by the princi-
pal", Natl. Carbide Corp. v. Commissioner, supra at 437, is
irrelevant to our resolving whether Rockport Advisors was Mr.
Ackerman's agent during each of petitioners' taxable years 1997,

---

[72]See supra note 9.

[73]See supra note 33.

1998, 2000, and 2002.  That is because the parties do not dispute that during each of those years Mr. Ackerman did not have an ownership interest in Rockport Advisors.  See <u>Shenker v. Commissioner</u>, 804 F.2d 109, 113 (8th Cir. 1986), affg. T.C. Memo. 1985-301.

With respect to the remaining five <u>National Carbide</u> factors, on the record before us, we find that petitioners have failed to carry their burden of establishing that during each of their taxable years 1997, 1998, 2000, and 2002 (1) Rockport Advisors acted in the name, and for the account, of Mr. Ackerman; (2) Rockport Advisors bound Mr. Ackerman by its actions; (3) Rockport Advisors transmitted money received to Mr. Ackerman; (4) the receipt of income by Rockport Advisors was attributable to the services of the employees of Mr. Ackerman and the assets belonging to Mr. Ackerman; or (5) the business purpose of Rockport Advisors was the carrying on of the normal duties of an agent.

On the record before us, we find that petitioners have failed to carry their burden of establishing that during each of petitioners' taxable years 1997, 1998, 2000, and 2002 Rockport Advisors was Mr. Ackerman's agent.

We turn now to Crown Capital.  We note initially that, as was true with respect to Rockport Advisors, the requirement included as one of the six <u>National Carbide</u> factors that the corporation's "relations with its principal must not be dependent

upon the fact that it is owned by the principal", Natl. Carbide Corp. v. Commissioner, 336 U.S. at 437, is irrelevant to our resolving whether Crown Capital was Mr. Ackerman's agent during each of the years at issue. That is because the parties do not dispute that during each of those years Mr. Ackerman did not have an ownership interest in Crown Capital. See Shenker v. Commissioner, supra at 113.

With respect to the remaining five National Carbide factors, on the record before us, we find that petitioners have failed to carry their burden of establishing that during each of the years at issue (1) Crown Capital acted in the name, and for the account, of Mr. Ackerman;[74] (2) Crown Capital bound Mr. Ackerman by its actions; (3) Crown Capital transmitted money received to Mr. Ackerman; (4) the receipt of income by Crown Capital was attributable to the services of the employees of Mr. Ackerman and the assets belonging to Mr. Ackerman;[75] or (5) the business purpose of Crown Capital was the carrying on of the normal duties of an agent.[76]

---

[74]See supra note 71.

[75]Although Mr. Ackerman paid Crown Capital the funds that it requested in order to assist it in carrying on its business activities, after he did, those funds became the funds of Crown Capital and no longer belonged to Mr. Ackerman.

[76]Moreover, on the record before us, we find that petitioners did not establish the following facts that would have been helpful in ensuring "the genuineness of the [claimed] agency
(continued...)

On the record before us, we find that petitioners have failed to carry their burden of establishing that during each of the years at issue Crown Capital was Mr. Ackerman's agent.

Petitioners' Compensation Argument

As we understand it, petitioners are arguing that during each of the years at issue Mr. Ackerman received compensation other than the normal investor's return for the advisory services that he provided during each of those years with respect to the major projects. Consequently, according to petitioners, under applicable caselaw, during each of the years at issue Mr. Ackerman was engaged in a trade or business of providing advisory services within the meaning of section 162(a). The principal case on which petitioners rely to support that argument is Giblin v. Commissioner, 227 F.2d 692 (5th Cir. 1955), revg. T.C. Memo.

---

[76](...continued)
relationship", Commissioner v. Bollinger, 485 U.S. at 349, between Crown Capital and Mr. Ackerman: (1) There was a written agreement that set forth that Crown Capital was an agent of Mr. Ackerman during any of the years at issue; (2) Crown Capital functioned for any purpose as an agent with respect to the major projects that he pursued during those years; and (3) Crown Capital was held out as an agent of Mr. Ackerman in all dealings with third parties relating to those projects during those years. To the contrary, we have found that during the years at issue Crown Capital, in its own name, entered into various management service agreements with the respective companies involved in certain of the projects that Mr. Ackerman pursued. Pursuant to those agreements, in exchange for certain fees to be paid by those respective companies to Crown Capital, Crown Capital was to provide certain services to them.

1954-186.[77]  According to petitioners, "Mr. Ackerman's business
was not dissimilar [to that of the taxpayer in Giblin], as he
helped people create and structure transactions."  What petition-
ers fail to understand or choose to ignore is that the fact that
Mr. Ackerman may have "helped people create and structure trans-
actions" in providing advisory services during the years at issue
with respect to the major projects is not determinative of
whether for each of those years he was engaged in a trade or
business of providing those services within the meaning of sec-
tion 162(a).

In Giblin v. Commissioner, supra, the United States Court of
Appeals for the Fifth Circuit (Court of Appeals for the Fifth
Circuit) addressed whether the taxpayer "was regularly engaged in
the business of seeking out business opportunities, promoting,
organizing and financing them, contributing to them substantially
50% of his time and energy and then disposing of them either at a
profit or loss".  The Court of Appeals for the Fifth Circuit held
that the taxpayer was engaged in that business.  In so holding,
that Court relied on, inter alia, Foss v. Commissioner, 75 F.2d

---

[77]Petitioners also rely on certain other cases to establish
that during each of the years at issue Mr. Ackerman was engaged
in a trade or business of providing advisory services within the
meaning of sec. 162(a).  We have carefully considered each of
those other cases.  We find all of them to be materially distin-
guishable from the instant cases and petitioners' reliance on
them to be misplaced.

326 (1st Cir. 1935), and <u>Sage v. Commissioner</u>, 15 T.C. 299

(1950).  <u>Giblin v. Commissioner</u>, <u>supra</u> at 696.

In <u>Whipple v. Commissioner</u>, 373 U.S. 193, 203 n.10 (1963),

which the Supreme Court decided after <u>Giblin</u>, the Supreme Court

expressly disapproved of any statements and holdings in <u>Foss</u> and

<u>Sage</u> that were contrary to its statements and holdings in

<u>Whipple</u>.  In <u>Whipple</u>, the Supreme Court addressed whether a

taxpayer who had furnished regular services to several corpora-

tions in which he was an investor was engaged in an independent

trade or business.  The Supreme Court held that "Absent substan-

tial additional evidence, furnishing management and other ser-

vices to corporations for a reward not different from that flow-

ing to an investor in those corporations is not a trade or busi-

ness".  <u>Id.</u> at 203 (fn. ref. omitted).  In so holding, the Su-

preme Court stated:

> Devoting one's time and energies to the affairs of
> a corporation is not of itself, and without more, a
> trade or business of the person so engaged.  Though
> such activities may produce income, profit or gain in
> the form of dividends or enhancement in the value of an
> investment, this return is distinctive to the process
> of investing and is generated by the successful opera-
> tion of the corporation's business as distinguished
> from the trade or business of the taxpayer himself.
> When the only return is that of an investor, the tax-
> payer has not satisfied his burden of demonstrating
> that he is engaged in a trade or business since invest-
> ing is not a trade or business and the return to the
> taxpayer, though substantially the product of his ser-
> vices, legally arises not from his own trade or busi-
> ness but from that of the corporation.  Even if the
> taxpayer demonstrates an independent trade or business
> of his own, care must be taken to distinguish bad debt

losses arising from his own business and those actually arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business.

If full-time service to one corporation does not alone amount to a trade or business, which it does not, it is difficult to understand how the same service to many corporations would suffice. To be sure, the presence of more than one corporation might lend support to a finding that the taxpayer was engaged in a regular course of promoting corporations for a fee or commission, * * * or for a profit on their sale, see Giblin v. Commissioner, 227 F.2d 692 * * *, but in such cases there is compensation other than the normal investor's return, income received directly for his own services rather than indirectly through the corporate enterprise * * *

Id. at 202-203.

Although, as quoted above, the Supreme Court in Whipple cited Giblin v. Commissioner, 227 F.2d 692 (5th Cir. 1955), it cited Giblin only for the narrow proposition that "the presence of more than one corporation might lend support to a finding that the taxpayer was engaged in a regular course of promoting corporations * * * for a profit on their sale". Whipple v. Commissioner, supra at 202-203. In citing Giblin for that narrow proposition, the Supreme Court emphasized that in order to conclude that a taxpayer is engaged in a trade or business "there * * * [must be] compensation other than the normal investor's return, income received directly for * * * [the taxpayer's] own services rather than indirectly through the corporate enterprise". Id. We must read Giblin in a manner that is consistent

with Whipple.  We did so in Deely v. Commissioner, 73 T.C. 1081
(1980), a case that petitioners do not cite.

In Deely, we addressed whether a taxpayer who had organized
and financed 26 companies was engaged in the trade or business of
promoting, organizing, financing, and/or dealing in corporations.
We held in Deely that the taxpayer was not engaged in that trade
or business.  Id. at 1096. In so holding, we stated:

> In order to establish a business separate from
> that of his corporations, * * * [the taxpayer] must
> show that the compensation he seeks from his activities
> is other than the normal investor's return and that
> income received is directly for his services rather
> than indirectly through the successful operation of the
> corporate enterprise.  Whipple v. Commissioner, supra
> at 203.
>
> * * * [The taxpayer] contends that he was in the
> separate business of promoting, organizing, financing,
> and/or dealing in corporations.  It seems clear from
> Whipple that to qualify such activities as a separate
> business they must be conducted for a fee or commission
> or with the immediate purpose of selling the corpora-
> tions at a profit in the ordinary course of that busi-
> ness. * * * There is no evidence in this case that
> * * * [the taxpayer] received any fees or commissions
> for organizing, financing, or promotional activities;
> instead, he usually invested or took an equity interest
> in the entities that he organized, promoted, or fi-
> nanced. * * *

Id. at 1093.

In reaching our holding in Deely v. Commissioner, supra at
1093, we considered Giblin v. Commissioner, supra.  We concluded
in Deely that in order to come within the holding in Giblin a
taxpayer must show that the taxpayer organized the entities in
which the taxpayer invested "with a view to a quick and profit-

able sale after each business had become established, rather than with a view to long-range investment gains."[78]  Id.

In contrast to the taxpayer in Giblin v. Commissioner, supra, petitioners do not claim, and presented no evidence, let alone credible evidence, see sec. 7491(a), establishing, that during each of the years at issue Mr. Ackerman provided advisory services pertaining to the finances and management of the respective companies involved in the major projects with the purpose of selling his respective interests in those companies at a profit in the ordinary course of his alleged business of providing those services.[79]  We find Giblin to be materially distinguishable from the instant cases and petitioners' reliance on that case to be misplaced.

On the record before us, we find that petitioners have failed to carry their burden of establishing that during each of the years at issue Mr. Ackerman provided advisory services with respect to the major projects with the purpose of selling his

---

[78]We observed in Deely v. Commissioner, 73 T.C. 1081, 1093 n.11 (1980), that "it would appear that Giblin v. Commissioner, 227 F.2d 692 (5th Cir. 1955), has been sapped of some of its vitality by the opinions of the Fifth Circuit in Bodzy v. Commissioner, 321 F.2d 331 (5th Cir. 1963); and United States v. Byck, 325 F.2d 551 (5th Cir. 1963)."

[79]Indeed, on the record before us, we find that petitioners have failed to establish that Mr. Ackerman sold any of his respective interests in the companies involved in the major projects in the ordinary course of his alleged business of providing advisory services.

interests in the respective companies involved in those projects at a profit in the ordinary course of his alleged business of providing those services.[80]  See Whipple v. Commissioner, 373 U.S. at 202-203; Deely v. Commissioner, supra at 1093; cf. Giblin v. Commissioner, supra.

We shall address now whether during each of the years at issue Mr. Ackerman provided advisory services with respect to each of the major projects in exchange for a fee or a commission or any other compensation other than the normal investor's return.  See Whipple v. Commissioner, supra at 202-203; Deely v. Commissioner, supra at 1093.

With respect to the major project pertaining to Equity Marketing (Equity Marketing project), petitioners claim that Mr. Ackerman received a fee in exchange for the advisory services that he provided with respect to that project.[81]  To support that claim, petitioners rely on the testimony of Mr. Ackerman on which we are unwilling to rely to establish petitioners' position with respect to their claimed Schedule C deductions.  In this regard,

_____

[80]See supra note 79.

[81]Petitioners reported no income, let alone income from the Equity Marketing project, in Schedule C for each of the years at issue.  Moreover, petitioners do not claim, and the record does not establish, that they reported in any other part of their joint returns for any of the years at issue the fee that petitioners claim Mr. Ackerman received in exchange for the advisory services that he provided with respect to the Equity Marketing project.

Mr. Ackerman testified that he received a fee in exchange for the advisory services that he provided with respect to the Equity Marketing project. Our understanding is that the fee to which Mr. Ackerman referred in his testimony is the commitment fee that Equity Marketing agreed to pay to Crown Acquisition Partners, or any of its affiliates, as part of Equity Marketing's agreement to sell to Crown Acquisition Partners certain shares of its stock and certain warrants to purchase certain other shares of its stock. There is no reliable evidence in the record establishing that Equity Marketing was required to, and did, pay the commitment fee required in the Equity Marketing securities purchase agreement in exchange for any advisory services that Mr. Ackerman provided to Equity Marketing. We have found that that commitment fee was required to be paid to Crown Acquisition Partners or one of its affiliates as part of Equity Marketing's agreement to sell to Crown Acquisition Partners certain shares of its stock and certain warrants to purchase certain other shares of its stock and that it was paid to Crown Capital, one of Crown Acquisition Partners' affiliates. That commitment fee was not required to be, and was not, paid to Mr. Ackerman.[82]

---

[82]The record does not establish, and petitioners do not even claim, that they reported in any of their joint returns for the years at issue the commitment fee required in the Equity Marketing securities purchase agreement. See supra note 81.

Petitioners claim not only that Mr. Ackerman received a fee in exchange for the advisory services that he provided with respect to the Equity Marketing project, but also that he received dividends in exchange for those services. The parties do not dispute that petitioners received, and reported in their joint return for each of their taxable years 2000 through 2006, certain dividend income from Equity Marketing that had flowed through, inter alia, Somerville. However, that fact does not support petitioners' position that Mr. Ackerman received compensation other than the normal investor's return in exchange for the advisory services that he provided with respect to the Equity Marketing project. The receipt of dividends is "distinctive to the process of investing and is generated by the successful operation of the corporation's business as distinguished from the trade or business of the taxpayer". Whipple v. Commissioner, supra at 202.

On the record before us, we find that petitioners did not introduce credible evidence, see sec. 7491(a)(1), and have failed to carry their burden of, establishing that Mr. Ackerman provided advisory services with respect to the Equity Marketing project in exchange for a fee or a commission or any other compensation other than the normal investor's return.

With respect to the major project pertaining to Thales Fund Management (Thales project), petitioners claim that Mr. Ackerman

received as compensation other than the normal investor's return certain equity interests in Thales Fund Management and/or one of its related entities in exchange for the advisory services that he provided with respect to that project. To support that claim, petitioners rely on the respective testimonies of Mr. Ackerman and Mr. Lerner on which we are unwilling to rely to establish petitioners' position with respect to their claimed Schedule C deductions. Although we have found that Mr. Ackerman indirectly owned certain equity interests in Thales Fund Management, Thales Capital, and Thales Fund, on the record before us, we find that petitioners have failed to carry their burden of establishing that Mr. Ackerman received those respective equity interests as compensation other than the normal investor's return for the advisory services that he provided with respect to the Thales project.[83]

---

[83]Petitioners reported no income, let alone income from the Thales project, in Schedule C for each of the years at issue. Nonetheless, petitioners argue that "Amounts received for services for Thales Fund Management were reported [by petitioners] through Somerville". In advancing that argument, petitioners point to the fact that Somerville reported in its Form 1065 its respective distributive shares of taxable income that were generated by the respective operations of (1) Thales Fund Management and Thales Capital for each of Somerville's taxable years 1999 through 2004 and (2) Thales Fund for each of Somerville's taxable years 1999, 2000, 2002, and 2004. Those respective distributive shares of taxable income that were generated by the respective operations of Thales Fund Management, Thales Capital, and Thales Fund did not represent compensation for Mr. Ackerman's advisory services.

On the record before us, we find that petitioners did not introduce credible evidence, see sec. 7491(a)(1), and have failed to carry their burden of, establishing that Mr. Ackerman provided advisory services with respect to the Thales project in exchange for a fee or a commission or any other compensation other than the normal investor's return.

With respect to the major project pertaining to Fresh Direct (Fresh Direct project), petitioners claim that Mr. Ackerman received as compensation other than the normal investor's return certain "'free' equity" in exchange for the advisory services that he provided with respect to that project.[84] To support that claim, petitioners rely on the respective testimonies of Mr. Ackerman and Jason Ackerman on which we are unwilling to rely to establish petitioners' position with respect to their claimed Schedule C deductions. In this regard, Mr. Ackerman testified at trial that (1) in exchange for the advisory services that he provided to Fresh Direct, he was able to purchase 83 percent of the stock of that company for the nominal amount of a penny a share, (2) the value of each of those shares eventually rose to

[84]Petitioners reported no income, let alone income from the Fresh Direct project, in Schedule C for each of the years at issue. Moreover, petitioners do not claim, and the record does not establish, that they reported in any of the joint returns for the years at issue any income, let alone income in the form of compensation other than the normal investor's return, from the Fresh Direct project.

$2, and (3) therefore he received "free equity" in Fresh Direct that had a value of $135 million.

Mr. Ackerman's testimony that, in exchange for the advisory services that he provided to Fresh Direct, he was able to purchase 83 percent of the stock of Fresh Direct for the nominal amount of a penny a share is apparently based on the assumption that the stock of Fresh Direct was worth more than a penny a share at the time Mr. Ackerman purchased 83 percent of that stock--an alleged fact that we are unable to find on the record before us. Mr. Ackerman's testimony that the value of the shares of stock of Fresh Direct that he purchased for a penny a share eventually rose to $2 a share and that therefore he received "free equity" in Fresh Direct valued at $135 million is apparently based on the assumption that any increase in the value of the Fresh Direct stock that he purchased establishes that he received compensation other than the normal investor's return for the advisory services that he provided with respect to the Fresh Direct project--a conclusion that is contrary to Whipple v. Commissioner, 373 U.S. 193 (1963). Any enhancement in the value of the Fresh Direct shares that Mr. Ackerman purchased "is distinctive to the process of investing and is generated by the successful operation of the corporation's [Fresh Direct's] business as distinguished from the trade or business of the taxpayer [Mr. Ackerman] himself." Id. at 202.

On the record before us, we find that petitioners did not introduce credible evidence, see sec. 7491(a)(1), and have failed to carry their burden of, establishing that Mr. Ackerman provided advisory services with respect to the Fresh Direct project in exchange for a fee or a commission or any other compensation other than the normal investor's return.

With respect to the major project pertaining to Resort Theaters (Resort Theaters project), petitioners claim that Mr. Ackerman received as compensation other than the normal investor's return certain "equity compensation" in Resort Theaters in exchange for the advisory services that he provided with respect to that project.[85] To support that claim, petitioners rely on the testimony of Mr. Lerner on which we are unwilling to rely to establish petitioners' position with respect to their claimed Schedule C deductions. We have found (1) that on February 18, 1999, Santa Monica, virtually all of which Mr. Ackerman owned indirectly, invested $14 million in Resort Theaters in return for which Santa Monica received a 100-percent ownership interest in Resort Theaters and (2) that Santa Monica reported in Form 1065 for its taxable year 2000 a long-term capital loss of $14 million

_____

[85]Petitioners reported no income, let alone income from the Resort Theaters project, in Schedule C for each of the years at issue. Moreover, petitioners do not claim, and the record does not establish, that they reported in any of the joint returns for the years at issue any income, let alone income in the form of compensation other than the normal investor's return, from the Resort Theaters project.

with respect to its investment in Resort Theaters.  On the record before us, we find that petitioners have failed to carry their burden of establishing that Mr. Ackerman received that indirect equity interest in Resort Theaters as compensation other than the normal investor's return for the advisory services that he provided with respect to the Resort Theaters project.

On the record before us, we find that petitioners did not introduce credible evidence, see sec. 7491(a)(1), and have failed to carry their burden of, establishing that Mr. Ackerman provided advisory services with respect to the Resort Theaters project in exchange for a fee or a commission or any other compensation other than the normal investor's return.

With respect to the major project pertaining to Davidson Cotton (Davidson Cotton project), petitioners claim that Mr. Ackerman received as compensation other than the normal investor's return what he characterized at trial as an "override" in exchange for the advisory services that he provided with respect to that project.[86]  To support that claim, petitioners rely on the testimony of Mr. Ackerman on which we are unwilling to rely to establish petitioners' position with respect to their claimed

---

[86]Petitioners reported no income, let alone income from the Davidson Cotton project, in Schedule C for each of the years at issue.  Moreover, petitioners do not claim, and the record does not establish, that they reported in any of the joint returns for the years at issue any income, let alone income in the form of compensation other than the normal investor's return, from the Davidson Cotton project.

Schedule C deductions. We understand the ordinary meaning of the term "override". However, we do not understand the meaning or the nature of the "override" to which Mr. Ackerman referred in his testimony.[87] We have found (1) that on December 3, 1999, Somerville, virtually all of which Mr. Ackerman owned indirectly, invested $15 million in Crown Davidson Partners and (2) that on the same date Crown Davidson Partners acquired 15,000 shares of preferred stock in Davidson Cotton.[88] On the record before us, we find that petitioners have failed to carry their burden of establishing that Mr. Ackerman received compensation other than the normal investor's return for the advisory services that he provided with respect to the Davidson Cotton project.

---

[87]Mr. Ackerman testified as follows with respect to the so-called override:

> And we negotiated, we went to Jacob Rothschild and basically negotiated an investment that he would come in on on which we negotiated an override and with an other Mexican investor where we negotiated an override.
>
> Now what I mean by we, * * * I meant Jeff Deutschman, Jason [Ackerman], and Perry [Lerner], and me as well, as a participant in the overrides we would get from these other people.
>
> For example, with Jacob Rothschild, we negotiated a 20 percent override. The relationship, each of the other three —- Perry, Jason and Jeff -- received three and a third percent of that override, of that 20 percent; I received ten percent of that override.

[88]See appendix A.

On the record before us, we find that petitioners did not introduce credible evidence, see sec. 7491(a)(1), and have failed to carry their burden of, establishing that Mr. Ackerman provided advisory services with respect to the Davidson Cotton project in exchange for a fee or a commission or any other compensation other than the normal investor's return.

On the record before us, we find that petitioners have failed to carry their burden of establishing that Mr. Ackerman provided advisory services with respect to the major projects in exchange for a fee or a commission or any other compensation other than the normal investor's return. See Whipple v. Commissioner, 373 U.S. at 202-203; Deely v. Commissioner, 73 T.C. at 1093.

It appears from the record before us, including the respective testimonies of Mr. Ackerman and Mr. Deutschman, that during the years at issue Mr. Ackerman provided advisory services with respect to the major projects as part of an investment strategy designed to determine whether to make investments in the respective companies involved in those projects and how to enhance the value of any such investments made.[89] By way of illustration, Mr.

---

[89]It was petitioners themselves who described Mr. Ackerman's "Principal business or profession, including product or service" in their Schedule C for each of the years at issue as "INVEST-MENTS AND BANKING". Petitioners do not claim, and the record does not establish, that Mr. Ackerman was engaged in the business of banking during any of the years at issue.

Ackerman testified with respect to the Equity Marketing project

that Equity Marketing

>came to me and asked me to make an equity investment
>and to also provide direct advice for them in the ac-
>quisition process.
>
>    What I then did was went to Jason [Ackerman],
>* * * [Mr. Deutschman] and * * * [Mr. Lerner] and said
>would you do the due diligence to see whether, number
>one, we had an investment that was of interest to us;
>and then to see more importantly as [to] whether we
>could add value from an advisory point of view in terms
>of their negotiating strategy.

By way of further illustration, Mr. Deutschman, the managing

director of Crown Capital, testified with respect to Mr.

Ackerman's relationship with Crown Capital[90] that "Crown Capital

was a private equity investment business set up to acquire con-

trol of middle-market companies or perhaps the seed, the growth

plans, of companies that exhibited attractive grown [sic] oppor-

tunities for the benefit of primarily Peter Ackerman."  According

to Mr. Deutschman, "The people in New York [i.e., the employees

of Crown Capital] were responsible for doing diligence, doing a

lot of detail work, reporting back to the managing directors and

Peter [Ackerman] as to the progress in various investments".

Based upon our examination of the entire record before us,

we find that petitioners have failed to carry their burden of

establishing that during each of the years at issue Mr. Ackerman

---

[90]Crown Capital was the recipient of substantially or virtu-
ally all of the payments that petitioners claimed in Schedule C
for each of the years at issue.

was carrying on a trade or business of advising companies about their finances and management within the meaning of section 162(a). On that record, we further find that petitioners have failed to carry their burden of establishing that they are entitled for each of those years to deduct under section 162(a) the Schedule C expenses that petitioners are claiming.

Claimed Deduction for the
Protection of Business Reputation

It is petitioners' position that they are entitled for their taxable year 1997 to deduct under section 162(a) the $7,850,000 that Mr. Ackerman, through Somerville S Trust, advanced to ECC and that was booked by both Somerville S Trust and ECC as a loan. In support of that position, petitioners argue (1) that the $7,850,000 that Mr. Ackerman advanced to ECC did not constitute a loan and (2) that Mr. Ackerman's primary motive in advancing those funds to ECC was to protect his business reputation.

It is respondent's position that petitioners are not entitled for their taxable year 1997 to deduct under section 162(a) the $7,850,000 that Mr. Ackerman, through Somerville S Trust, advanced to ECC. In support of that position, respondent argues that the transfer of those funds constituted a loan from Somerville S Trust to ECC. Respondent further argues:

> It is clear that the transfers in question were part of a substantial capital investment by Somerville S Trust in the International Group. The transfers were contemporaneous with the formation in 1997 of the individual members of the International Group. Economy

Color Card was acquired by ISI in 1997, and its assets and operations were absorbed into the International Group. Not only did the International Group carry on the business of Economy Color Card, it also sought to develop new areas of business. Clearly the transfers were part of a larger investment in the International Group. * * *[91]

We need not resolve the parties' dispute over whether for tax purposes the $7,850,000 that Mr. Ackerman advanced to ECC constituted a loan from Somerville S Trust to ECC. That is because, even if we were to find, as petitioners contend, that that transfer did not constitute a loan, any such finding would not affect our ultimate finding with respect to the deductibility under section 162(a) of the $7,850,000 of advanced funds.

Petitioners acknowledge that generally a taxpayer may not deduct the expenses paid on behalf of another. See <u>Welch v. Helvering</u>, 290 U.S. 111 (1933). Petitioners nonetheless argue that they are entitled to deduct under section 162(a) the $7,850,000 of advanced funds because Mr. Ackerman's primary motive in advancing those funds was to protect his business reputation and not to acquire any capital asset or protect an investment. In support of that argument, petitioners rely on, inter alia, <u>Allen v. Commissioner</u>, 283 F.2d 785 (7th Cir. 1960),

_____

[91]Respondent argues in the alternative that petitioners are "barred by * * * the TEFRA partnership provisions" from claiming a deduction with respect to the $7,850,000 of advanced funds for their taxable year 1997. See <u>infra</u> note 96.

affg. in part and revg. in part T.C. Memo. 1959-227, and Lohrke
v. Commissioner, 48 T.C. 679 (1967) (discussed below).

Although it is not altogether clear, petitioners appear to
be arguing that the business reputation that Mr. Ackerman was
seeking to protect was his reputation in his alleged business of
advising companies about their finances and management.  We have
found that petitioners have failed to carry their burden of
establishing that during any of the taxable years at issue,
including 1997 for which petitioners are claiming a deduction
with respect to the $7,850,000 of advanced funds, Mr. Ackerman
was carrying on a trade or business of advising companies about
their finances and management within the meaning of section
162(a).

Assuming arguendo that petitioners had carried their burden
of establishing that during their taxable year 1997 Mr. Ackerman
was carrying on a trade or business of advising companies about
their finances and management within the meaning of section
162(a), on the instant record, we nonetheless would, and do
below, reject petitioners' contention that Mr. Ackerman, through
Somerville S Trust, advanced $7,850,000 to ECC in order to pro-
tect his reputation in that alleged business.

In deciding whether petitioners are entitled for their
taxable year 1997 to deduct under section 162(a) the $7,850,000
of advanced funds, we must determine whether Mr. Ackerman's

primary motive in advancing those funds to ECC was to protect his reputation in his alleged business of providing advisory services. See Capital Video Corp. v. Commissioner, 311 F.3d 458, 464 (1st Cir. 2002), affg. T.C. Memo. 2002-40; Lohrke v. Commissioner, supra.

In support of their claim that Mr. Ackerman's primary motive in advancing $7,850,000 to ECC was to protect his reputation in his alleged business of providing advisory services, petitioners rely on the respective testimonies of Mr. Ackerman, Jason Ackerman, Don Ackerman, and Mr. Lerner on which we are unwilling to rely to establish petitioners' position with respect to their claimed deduction under section 162(a) of the $7,850,000 of advanced funds. They also rely on the testimony of Mr. Braddock.

Mr. Braddock testified that he knew nothing about the business of ECC. Mr. Braddock also testified that he was not even aware at the time in 1997 Mr. Ackerman made advances totaling $7,850,000 to ECC that Mr. Ackerman was making those advances. Mr. Braddock thus could not have known at that time, and he did not testify about, why Mr. Ackerman advanced a total of $7,850,000 to ECC. We are unable to find from Mr. Braddock's testimony that Mr. Ackerman's primary motive in advancing those funds to ECC was to protect Mr. Ackerman's reputation in his alleged business of providing advisory services.

We turn now to <u>Allen v. Commissioner</u>, <u>supra</u>, and <u>Lohrke v.</u>
<u>Commissioner</u>, <u>supra</u>, on which, inter alia, petitioners rely to
support their position that they are entitled to deduct under
section 162(a) the $7,850,000 of advanced funds.[92]

In <u>Allen v. Commissioner</u>, <u>supra</u>, the United States Court of
Appeals for the Seventh Circuit (Court of Appeals for the Seventh
Circuit) addressed whether the president (Mr. Allen) of a corpo-
ration (Tucson corporation), who was a stockholder of that corpo-
ration, was entitled to deduct as an ordinary and necessary
business expense $10,000 ($10,000 of Tucson funds) that he had
advanced to that corporation so that it could make certain pay-
ments to its creditors.  That court held that Mr. Allen was
entitled to do so.  <u>Id.</u> at 791.  In so holding, the Court of
Appeals for the Seventh Circuit examined Mr. Allen's purpose in
advancing those funds.  <u>Id.</u> at 790.  That court found that Mr.
Allen advanced the $10,000 of Tucson funds "to protect the repu-
tation and credit standing" of his sole proprietorship.  <u>Id.</u>  In
making that finding, the Court of Appeals for the Seventh Circuit
noted that the Tucson corporation was in the process of liquidat-
ing when Mr. Allen advanced $10,000 to it and that "The condition

_____

[92]Petitioners also rely on certain other cases to establish
that they are entitled to deduct under sec. 162(a) the $7,850,000
of advanced funds.  We have carefully considered each of those
other cases.  We find all of them to be materially distinguish-
able from the case at docket No. 13947-06 and petitioners'
reliance on them to be misplaced.

of the [Tucson] corporation and its business belie any intention

of making an investment in the corporation or its business."[93]

Id.  That Court further reasoned that

> the record demonstrates, as taxpayer testified and
> contends, he made the payment to protect the reputation
> and credit standing of his Milwaukee business opera-
> tion, a highly successful venture.  Default and bank-
> ruptcy of the Tucson corporation under his presidency
> and management could but reflect adversely on the busi-
> ness reputation of taxpayer's similar Milwaukee enter-
> prise as a sole proprietor. * * *

Id.

In Lohrke v. Commissioner, 48 T.C. 679 (1967), the Tax Court

of the United States, a predecessor of this Court, addressed

whether a taxpayer (Mr. Lohrke), who owned a substantial interest

in a corporation (Textiles), was entitled to deduct as an ordi-

nary and necessary business expense a payment (Textiles payment)

that he had made to a customer of that corporation.  That Court

held that Mr. Lohrke was entitled to do so.  Id. at 689.  In so

holding, the Tax Court of the United States examined Mr. Lohrke's

purpose in making the Textiles payment.  Id. at 688-689.  That

---

[93]The Court of Appeals for the Seventh Circuit further held
in Allen v. Commissioner, 283 F.2d 785, 791 (7th Cir. 1960),
affg. in part and revg. in part T.C. Memo. 1959-227, that Mr.
Allen was not entitled to deduct as ordinary and necessary
business expenses certain other payments that he had advanced to
the Tucson corporation before it was in the process of liquidat-
ing.  The Court of Appeals for the Seventh Circuit held that
those payments, which were advanced as working capital, did not
"bear the requisite relationship to the taxpayer's business to
qualify them for treatment as other than capital losses or non-
business losses".  Id.

Court found that Mr. Lohrke's ultimate purpose in making that payment was to protect or promote his own business, and not to keep Textiles in existence. Id. at 689. The Tax Court of the United States found in Lohrke:

> We are inclined to believe that the [taxpayer's] * * * primary motive was the protection of his licensing business. That business was providing him with a substantial income, and therefore, we can believe him when he says that he acted to protect that business. On the contrary, Textiles was unprofitable, and the prospects were that it would remain so. Thus, we think that the most likely explanation is that he acted to protect his profitable individual business.

Id. at 689.

We find the respective facts in Allen v. Commissioner, 283 F.2d 785 (7th Cir. 1960), and Lohrke v. Commissioner, supra, to be materially distinguishable from the facts before us and petitioners' reliance on those cases to be misplaced. Unlike the respective facts in Allen and Lohrke, here, around the time in 1997 Mr. Ackerman had decided to advance, and was advancing, $7,850,000 to ECC, a decision had been made to form the International Group[94] in order to continue ECC's operations in modified form. In addition, unlike the respective facts in Allen and Lohrke, around the time in 1997 Mr. Ackerman had decided to advance, and was advancing, $7,850,000 to ECC, he also decided to make, and was making, through Somerville an investment of

_____

[94]The International Group consisted of ISI, ISG, and ISGH. See supra note 39.

$18,050,000 in the International Group by investing that amount in ISI.[95]

On the record before us, we find that petitioners have failed to carry their burden of establishing that Mr. Ackerman's primary motive in advancing $7,850,000 to ECC was to protect his reputation in his alleged business of providing advisory services. It appears from that record that Mr. Ackerman's primary motive in advancing those funds to ECC was to protect the investment that he intended to, and did, make in the International Group, a group of companies formed in order to continue ECC's operations in modified form.

Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing that they are entitled for their taxable year 1997

---

[95]ECC was also an investor in ISI. ECC contributed to ISI over $15 million of assets, including a substantial amount of cash, in return for which it received a 1-percent interest in ISI. Included in the assets that ECC contributed to ISI were substantial amounts of inventory, certain accounts receivable, certain intangible assets in the form of customer relationships, certain employee relationships, certain leasehold interests, and substantial amounts of machinery and equipment that were used in the production of sample cards and packaging projects. Those assets, along with the substantial amount of cash that ECC contributed to ISI, assisted the International Group in continuing the operations of ECC in modified form. The record does not disclose how ECC, a company facing dire financial circumstances in 1997, had a substantial amount of cash to contribute to ISI or whether the cash that ECC contributed to ISI consisted of a portion of the $7,850,000 that Mr. Ackerman had advanced to ECC.

to deduct under section 162(a) the $7,850,000 that Mr. Ackerman, through Somerville S Trust, advanced to ECC.[96]

Claimed Losses With Respect to ISI

It is petitioners' position that Mr. Ackerman's allocable portions of the respective 1998 ISI loss and 2000 ISI loss are not passive activity losses within the meaning of section 469(a). That is because, according to petitioners, Mr. Ackerman should be treated as having materially participated in ISI's business during each of petitioners' taxable years 1998 and 2000.[97]

---

[96]Respondent argues in the alternative, see supra note 91, that petitioners are "barred by * * * the TEFRA partnership provisions" from claiming a deduction with respect to the $7,850,000 of advanced funds for their taxable year 1997. In this regard, Santa Monica, which owned Somerville during each of the years at issue and which was subject to the provisions of secs. 6221 through 6234 for each of those years, included in Form 1065 for its taxable year 2000 the bad debt deduction of $7,850,000 that Somerville claimed with respect to those funds in Form 1065 that it prepared for its taxable year 2000 but did not file because it was a disregarded entity. See supra note 7. During each of the years at issue, Mr. Ackerman owned virtually all of Santa Monica through Somerville S Trust. Pursuant to sec. 6222(a), petitioners reported in Schedule E of their 2000 joint return Somerville S Trust's allocable share of Santa Monica's claimed 2000 ordinary loss, which included Somerville's claimed bad debt deduction of $7,850,000. Petitioners now want to deviate from not only the bad debt tax treatment that Santa Monica, as the owner of Somerville, claimed for the $7,850,000 of advanced funds but also the year (i.e., 2000) for which Santa Monica claimed that treatment. Petitioners here claim a deduction for their taxable year 1997 for the $7,850,000 of advanced funds as an ordinary and necessary business expense under sec. 162(a). Sec. 6222(a) does not allow them to do so.

[97]The parties do not dispute that if Mr. Ackerman materially participated in the business of ISI during each of petitioners' taxable years 1998 and 2000, petitioners are entitled (1) for

(continued...)

Pursuant to section 469(a), a passive activity loss of an individual for the taxable year is generally not allowed as a deduction for that year.[98]  For this purpose, the passive activity loss for the taxable year is generally the amount, if any, by which the passive activity deductions for the taxable year exceed the passive activity gross income for such year.  Sec. 469(d)(1). As pertinent here, section 469(c)(1) defines the term "passive activity" to include any activity which involves the conduct of any trade or business and in which the taxpayer does not materially participate.  For purposes of section 469(c)(1)(A), the term "trade or business" is defined in section 469(c)(6) to include any activity in connection with a trade or business or any activity with respect to which expenses are allowable as a deduction under section 212.

Section 469(h)(1) provides that generally an individual is to be treated as materially participating in an activity only if such individual is involved in the operations of the activity on a basis that is regular, continuous, and substantial.  Congress expressly authorized the Secretary of the Treasury to prescribe regulations as may be necessary or appropriate to carry out the

---

[97](...continued)
their taxable year 1998 to deduct Mr. Ackerman's allocable portion of the 1998 ISI loss and (2) for petitioners' taxable year 2000 to deduct his allocable portion of the 2000 ISI loss.

[98]A disallowed passive activity loss for a taxable year is generally treated as a deduction allocable to a passive activity for the next year.  Sec. 469(b).

provisions of section 469, including regulations that specify

"what constitutes * * * material participation".  Sec. 469(l)(1).

Both temporary and final regulations relating to the meaning

of the terms "participation" and "material participation" have

been promulgated under section 469.  With respect to the term

"participation", final regulations issued under section 469

provide that generally

> any work done by an individual (without regard to the
> capacity in which the individual does the work) in
> connection with an activity in which the individual
> owns an interest at the time the work is done shall be
> treated for purposes of this section as participation
> of the individual in the activity.

Sec. 1.469-5(f)(1), Income Tax Regs.  Temporary regulations

issued under section 469 provide certain exceptions to that

definition of participation.  As pertinent here, section 1.469-

5T(f)(2)(ii)(A), Temporary Income Tax Regs., 53 Fed. Reg. 5727

(Feb. 25, 1988), provides that work done by an individual in such

individual's capacity as an investor in an activity is not to be

treated as participation by the individual in the activity unless

the individual is involved in the day-to-day management or opera-

tions of the activity.  For this purpose, work done by an indi-

vidual in such individual's capacity as an investor in an activ-

ity includes:

> (1) Studying and reviewing financial statements or
> reports on operations of the activity;

(2) Preparing or compiling summaries or analyses of the finances or operations of the activity for the individual's own use; and

(3) Monitoring the finances or operations of the activity in a non-managerial capacity.

Sec. 1.469-5T(f)(2)(ii)(B), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988).

As pertinent here, temporary regulations relating to when a taxpayer is to be treated as "materially participating" in an activity for purposes of section 469(h)(1) provide that in general

an individual shall be treated, for purposes of section 469 and the regulations thereunder, as materially participating in an activity for the taxable year if and only if--

(1) The individual participates in the activity for more than 500 hours during such year * * *

Sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988).

As also pertinent here, section 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988), provides that

The extent of an individual's participation in an activity may be established by any reasonable means. Contemporaneous daily time reports, logs, or similar documents are not required if the extent of such participation may be established by other reasonable means. Reasonable means for purposes of this paragraph may include but are not limited to the identification of services performed over a period of time and the approximate number of hours spent performing such services during such period, based on appointment books, calendars, or narrative summaries.

According to petitioners, Mr. Ackerman should be treated for each of their taxable years 1998 and 2000 as having materially participated in ISI's business within the meaning of section 469(h)(1) because he participated in ISI's business for more than 500 hours during each of those years and therefore satisfies section 1.469-5T(a)(1), Temporary Income Tax Regs., <u>supra</u>.[99] Respondent counters (1) that any "participation" by Mr. Ackerman in ISI's activities was performed in his capacity as an investor and (2) that petitioners have failed to carry their burden of establishing that during each of their taxable years 1998 and 2000 Mr. Ackerman participated in ISI's business for more than 500 hours.  We need not address respondent's contention that any "participation" by Mr. Ackerman in ISI's activities was performed in his capacity as an investor.  That is because, assuming arguendo that we were to agree with petitioners that the work done by Mr. Ackerman with respect to ISI's activities was not done in his capacity as an investor, we nonetheless would, and do below, find that petitioners have failed to carry their burden of establishing that during each of their taxable years 1998 and 2000 Mr. Ackerman participated in ISI's business for more than 500 hours.

---

[99]Petitioners do not rely on any of the other provisions in sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725-5726 (Feb. 25, 1988), in support of their position that Mr. Ackerman should be treated as having materially participated in ISI's business within the meaning of sec. 469(h)(1).

In support of their position under section 1.469-5T(a)(1), Temporary Income Tax Regs., supra, petitioners rely principally on the respective testimonies of Mr. Ackerman,[100] Mr. Deutschman, and Don Ackerman on which we are unwilling to rely to establish petitioners' position with respect to whether Mr. Ackerman's allocable portions of the respective 1998 ISI loss and 2000 ISI loss are passive activity losses within the meaning of section 469(a).  Although we are unwilling to rely on Mr. Deutschman's testimony to establish that position of petitioners, we have found based on, inter alia, his testimony that during 1998 through 2000 Mr. Ackerman communicated on various occasions with Mr. Deutschman regarding various matters, including the business operations and finances of the International Group and various other investments of Mr. Ackerman.  However, we have not found any reliable evidence in the record establishing the amount of time that Mr. Ackerman spent during each of the years 1998 and 2000 communicating with Mr. Deutschman on matters relating to the International Group.

We have also found based on, inter alia, Mr. Deutschman's testimony that during 1998 through 2000 Mr. Ackerman spent at

---

[100]The lack of knowledge that Mr. Ackerman exhibited at trial regarding the affairs of the International Group, which consisted of ISI, ISG, and ISGH, belies his claimed participation in ISI's business.  For example, Mr. Ackerman was unable to answer certain questions at trial regarding the affairs of the International Group, including whether the International Group's production facility had been moved and whether the International Group conducted any operations in New York City.

least one or two days in certain weeks in New York City and that during that period he also visited New Jersey where his mother and his brother Don Ackerman lived. We have further found on the record before us (1) that while in New York City Mr. Ackerman spent time on various matters, including matters relating to certain of the major projects in which Crown Capital was involved and certain charitable activities relating to CARE, and (2) that while in New Jersey Mr. Ackerman occasionally visited Mr. Deutschman where Mr. Deutschman managed the operations of the International Group. However, we have not found any reliable evidence in the record establishing the amount of time, if any, that Mr. Ackerman spent during each of the years 1998 and 2000 in New York and/or New Jersey on matters relating to the International Group.

In support of their position under section 1.469-5T(a)(1), Temporary Income Tax Regs., supra, petitioners also rely on the following documentary evidence: (1) A memorandum dated July 9, 1999, from Mr. Deutschman to Mr. Ackerman and Jason Ackerman (1999 memorandum) that addresses (a) ISG's expected cashflow for the six-month period July through December 1999, (b) a review of ISG's then current operations in Mexico, (c) certain adjustments that were to be made with respect to a deal in which ISG was involved, and (d) a preliminary forecast of ISG's operations for 2000; (2) a printed copy of an e-mail dated July 15, 1999, from

Mr. Deutschman to Mr. Ackerman (1999 e-mail), which sets forth the amount of funding that ISG needed for July and August 1999 and to which was attached a schedule of legal fees that ISG and certain "related entities"[101] incurred at the end of 1998 and in 1999; and (3) certain travel itineraries of Mr. Ackerman (Mr. Ackerman's itineraries) covering the periods April 28, 1998, through June 24, 1999, and September 27 through December 5, 2001.

With respect to the 1999 memorandum, that document establishes that Mr. Ackerman was involved in certain matters relating to the business operations of the International Group. However, the 1999 memorandum does not establish the amount of time that Mr. Ackerman spent during each of the years 1998 and 2000 on matters relating to the International Group.

With respect to the 1999 e-mail and the attachment thereto, those documents establish that Mr. Deutschman informed Mr. Ackerman that ISG and/or certain of its related entities needed funding and/or had incurred certain legal fees. However, the 1999 e-mail and the attachment thereto do not establish the amount of time that Mr. Ackerman spent during each of the years 1998 and 2000 on matters relating to the International Group.

With respect to Mr. Ackerman's itineraries covering the periods April 28, 1998, through June 24, 1999, and September 27 through December 5, 2001, those itineraries establish that during

---

[101]The record does not disclose the related entities of ISG to which the 1999 e-mail was referring.

those two periods Mr. Ackerman was scheduled to take certain trips to New York City and/or New Jersey. However, those itineraries do not establish that on any of those trips Mr. Ackerman spent time during each of the years 1998 and 2000 on matters relating to the International Group, let alone the amount of time that Mr. Ackerman might have spent during each of those years on any such matters.

Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing that for each of their taxable years 1998 and 2000 Mr. Ackerman participated in ISI's business for more than 500 hours and that therefore he should be treated as having materially participated in ISI's business under section 1.469-5T(a)(1), Temporary Income Tax Regs., supra. On that record, we further find that petitioners have failed to carry their burden of establishing that Mr. Ackerman's allocable portions of the respective 1998 ISI loss and 2000 ISI loss are not passive activity losses within the meaning of section 469(a).

Claimed Theft Loss Deduction

It is petitioners' position that they are entitled for their taxable year 2002 to deduct under section 165(a) a theft loss with respect to the $4,467,610 that Mr. Ackerman, through Somerville S Trust, invested in USV (claimed theft loss). In support of that position, petitioners argue that the actions of

Mr. Earls with respect to that investment constitute theft under the law of the District of Columbia (D.C. law) and that as of the end of their taxable year 2002 there was no reasonable prospect of recovery with respect to the loss resulting from that theft.

As pertinent here, section 165(a) allows a deduction for any theft loss sustained during the taxable year that is not compensated for by insurance or otherwise. See sec. 165(c)(3). A theft loss is sustained during the taxable year in which the taxpayer discovers it. Sec. 165(e). However,

> if in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained, for purposes of section 165, until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received.

Sec. 1.165-1(d)(3), Income Tax Regs. As this Court concluded in Viehweg v. Commissioner, 90 T.C. 1248, 1255-1256 (1988), "If in the year of the discovery of the loss there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, then there is no closed and completed transaction fixed by identifiable events and thus no deductible loss."

A reasonable prospect of recovery exists when the taxpayer has a bona fide claim for recoupment and there is a substantial possibility that such claim will be decided favorably for the taxpayer. Ramsay Scarlett & Co. v. Commissioner, 61 T.C. 795, 811 (1974), affd. 521 F.2d 786 (4th Cir. 1975). Whether a rea-

sonable prospect of recovery exists is determined as of the end of the taxable year for which the deduction is claimed.  Id.

Petitioners argue, and respondent does not dispute, that D.C. law determines whether the actions of Mr. Earls with respect to the $4,467,610 that Mr. Ackerman, through Somerville S Trust, invested in USV constitute theft.  Petitioners and respondent disagree over whether those actions constitute theft under D.C. law.  We need not resolve that disagreement.  That is because, assuming arguendo that we were to find that the actions of Mr. Earls with respect to the $4,467,610 that Mr. Ackerman, through Somerville S Trust, invested in USV constituted theft under D.C. law, on the instant record, we nonetheless would, and do below, reject petitioners' position that they are entitled for their taxable year 2002 to a deduction under section 165 with respect to the claimed theft loss.

We have found that Mr. Ackerman became aware of the claimed theft loss in 2002 and that on December 9, 2002, in an effort to recover damages of approximately $5,953,000 with respect to that loss, Somerville S Trust and certain other parties filed a lawsuit in the U.S. District Court for Maryland against Mr. Ferreira and Ferreira & Isbell.  Somerville S Trust pursued that lawsuit until November 26, 2003, when the parties involved in the Ferreira litigation filed a stipulation of dismissal.  We have also found that on August 21, 2003, in an effort to recover

damages of at least $5,952,860 with respect to the claimed theft loss, Somerville S Trust filed a lawsuit in the U.S. District Court for the District of Columbia against, inter alia, Mr. Earls, USV Partners, and U.S. Technologies.  The pendency of the above-described lawsuits to recover the claimed theft loss gives rise to an inference that as of the end of their taxable year 2002 Somerville S Trust had a claim for reimbursement that provided a reasonable prospect of recovery with respect to that claimed loss.[102]  See Dawn v. Commissioner, 675 F.2d 1077, 1078 (9th Cir. 1982), affg. T.C. Memo. 1979-479; Gale v. Commissioner, 41 T.C. 269, 276 (1963).

Based upon our examination of the entire record before us, we find that petitioners have failed to carry their burden of establishing that as of the end of 2002 there was no reasonable prospect of recovery of the $4,467,610 that Mr. Ackerman, through

---

[102]Somerville S Trust did not file the lawsuit in the U.S. District Court for the District of Columbia against, inter alia, Mr. Earls, USV Partners, and U.S. Technologies until Aug. 21, 2003.  However, that fact does not negate the inference that as of the end of their taxable year 2002 Somerville S Trust had a claim for reimbursement that provided a reasonable prospect of recovery with respect to the claimed theft loss.  See Dawn v. Commissioner, 675 F.2d 1077, 1078 (9th Cir. 1982), affg. T.C. Memo. 1979-479; Natl. Home Prods., Inc. v. Commissioner, 71 T.C. 501, 523, 525-526 (1979).  Moreover, on the record before us, we are unable to find that the lawsuits that Somerville S Trust filed on Dec. 9, 2002, and Aug. 21, 2003, were "'specious, speculative, or wholly without merit'".  Gale v. Commissioner, 41 T.C. 269, 274 (1963) (quoting Estate of Scofield v. Commissioner, 266 F.2d 154, 159 (6th Cir. 1959), revg. on this issue 25 T.C. 774 (1956)).

Somerville S Trust, invested in USV.  On that record, we further find that petitioners have failed to carry their burden of establishing that they are entitled for their taxable year 2002 to deduct under section 165(a) the claimed theft loss.

Accuracy-Related Penalty Under Section 6662(a)

In the notice for 2002 and 2004, respondent determined that petitioners are liable for each of those years for the accuracy-related penalty under section 6662(a).  According to respondent, petitioners are liable for those penalties because of substantial understatements of tax under section 6662(b)(2) that are attributable solely to the respective Schedule C deductions claimed in the 2002 joint return and the 2004 joint return.

Section 6662(a) imposes an accuracy-related penalty equal to 20 percent of the underpayment of tax attributable to, inter alia, a substantial understatement of tax, sec. 6662(b)(2).  An understatement is equal to the excess of the amount of tax required to be shown in the tax return over the amount of tax shown in the tax return, sec. 6662(d)(2)(A), and is substantial in the case of an individual if it exceeds the greater of 10 percent of the tax required to be shown or $5,000, sec. 6662(d)(1)(A).

The amount of the understatement is to be reduced to the extent that it is attributable to, inter alia, the tax treatment of an item for which there is or was substantial authority.  See sec. 6662(d)(2)(B)(i).  In order to satisfy the substantial

authority standard of section 6662(d)(2)(B)(i), petitioners must show that the weight of authorities supporting their tax return is substantial in relation to those supporting a contrary position.  See Antonides v. Commissioner, 91 T.C. 686, 702 (1988), affd. 893 F.2d 656 (4th Cir. 1990).  That standard is not so stringent that a taxpayer's treatment must be one that is ultimately upheld in litigation or that has a greater than 50-percent likelihood of being sustained in litigation.  Sec. 1.6662-4(d)(2), Income Tax Regs.  A taxpayer may have substantial authority for a position even where it is supported only by a well-reasoned construction of the pertinent statutory provision as applied to the relevant facts.  See sec. 1.6662-4(d)(3)(ii), Income Tax Regs.  There may be substantial authority for more than one position with respect to the same item.  Sec. 1.6662-4(d)(3)(i), Income Tax Regs.

The accuracy-related penalty under section 6662(a) does not apply to any portion of an underpayment if it is shown that there was reasonable cause for, and that the taxpayer acted in good faith with respect to, such portion.  Sec. 6664(c)(1).  The determination of whether the taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including the taxpayer's efforts to assess such taxpayer's proper tax liability, the knowledge and experience of the taxpayer, and the reliance on the advice of a professional, such

as an accountant.  Sec. 1.6664-4(b)(1), Income Tax Regs.  Reli-
ance on the advice of a professional does not necessarily demon-
strate reasonable cause and good faith unless, under all the
circumstances, such reliance was reasonable and the taxpayer
acted in good faith.  Id.  In this connection, a taxpayer must
demonstrate that the taxpayer's reliance on the advice of a
professional concerning substantive tax law was objectively
reasonable.  Goldman v. Commissioner, 39 F.3d 402, 408 (2d Cir.
1994), affg. T.C. Memo. 1993-480.  A taxpayer's reliance on the
advice of a professional will be objectively reasonable only if
the taxpayer has provided necessary and accurate information to
the professional.  Neonatology Associates, P.A. v. Commissioner,
115 T.C. 43, 99 (2000), affd. 299 F.3d 221 (3d Cir. 2002); see
also Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978).

Petitioners argue that they are not liable for each of their
taxable years 2002 and 2004 for the accuracy-related penalty
under section 6662(a) because respondent has failed to "introduce
some evidence that it was appropriate to assert" that penalty.
As we understand it, petitioners are arguing that respondent has
not satisfied respondent's burden of production under section
7491(c) with respect to those accuracy-related penalties.  On the
record before us, we reject that argument.

To meet respondent's burden of production under section 7491(c), respondent must come forward with sufficient evidence showing that it is appropriate to impose the accuracy-related penalty under section 6662(a) for each of petitioners' taxable years 2002 and 2004. See Higbee v. Commissioner, 116 T.C. 438, 446 (2001). The accuracy-related penalty that respondent determined for each of petitioners' taxable years 2002 and 2004 is imposed on an underpayment of tax for each of those years that is attributable to a substantial understatement of tax resulting from respondent's disallowance of petitioners' claimed Schedule C deductions, which we have sustained. On the record before us, we find that respondent has satisfied respondent's burden of production under section 7491(c) with respect to the accuracy-related penalty under section 6662(a) that respondent determined for each of petitioners' taxable years 2002 and 2004.

Although respondent bears, and has satisfied, the burden of production with respect to the accuracy-related penalties at issue, respondent "need not introduce evidence regarding reasonable cause, substantial authority, or similar provisions. * * * the taxpayer bears the burden of proof with regard to those issues." Higbee v. Commissioner, supra at 446. As discussed above, petitioners do not dispute that they bear the burden of proof with respect to the accuracy-related penalty under section 6662(a) that respondent determined for each of their taxable

years 2002 and 2004.  Instead, petitioners argue that they are not liable for each of those years for that penalty because (1) there was substantial authority to support their tax return position with respect to their respective claimed Schedule C deductions for 2002 and 2004 (petitioners' substantial authority argument), and (2) they acted with reasonable cause and in good faith in taking that position (petitioners' reasonable cause argument).

We turn first to petitioners' substantial authority argument.  It is petitioners' position that they had substantial authority for their respective claimed Schedule C deductions in the 2002 joint return and the 2004 joint return that respondent disallowed, thereby resulting in a substantial understatement of tax for each of those years.  According to petitioners, they claimed those Schedule C deductions because during each of petitioners' taxable years 2002 and 2004 Mr. Ackerman was engaged in a trade or business of providing advisory services within the meaning of section 162(a).  The principal authorities on which petitioners rely to establish their claim about Mr. Ackerman's alleged business are Revenue Ruling 56-542 and Giblin v. Commissioner, 227 F.2d 692 (5th Cir. 1955).  We found those authorities to be materially distinguishable from the instant cases and

petitioners' reliance on those authorities to be misplaced.[103]  On
the record before us, we reject petitioners' substantial author-
ity argument.

We turn now to petitioners' reasonable cause argument.  As
we understand it, it is petitioners' position that they acted
with reasonable cause and in good faith in claiming the respec-
tive Schedule C deductions in the 2002 joint return and the 2004
joint return because they relied on Mr. Levinton and Mr. Lerner
in claiming those deductions.[104]

Mr. Ackerman's own testimony undermines petitioners' reason-
able cause argument.  The trial transcript reflects that the
following exchange took place between petitioners' counsel and
Mr. Ackerman on direct examination:

> Q    Mr., Ackerman, are there ever situations, and
> I'm talking the period 1997 through 2004, where tax
> reporting issues come to your attention before a tax
> return is filed?  Do you remember any situations?
>
> A    No.
>
> Q    Well, how about the deduction of the Schedule
> C business expenses for 2002 and 2004?
>
> A    I'm sorry.  I was told that that was at is-
> sue.

---

[103]We also found the other cases on which petitioners rely to
establish that during each of the years at issue Mr. Ackerman was
engaged in a trade or business of providing advisory services
within the meaning of sec. 162(a) to be materially distinguish-
able from the instant cases and petitioners' reliance on those
other cases to be misplaced.  See supra note 77.

[104]Mr. Miller prepared the 2002 joint return and the 2004
joint return.

Q    Okay. * * * Why did you understand or what were you told in terms of it being at issue?

A    Mr. Levinton and Mr. Lerner said that they were told that certain of my expenses for the businesses that I was in would not be accepted for a deduction.

Q    Okay.  And what did you and they discuss about them, if anything?

A    Well, frankly, I was incredulous because how could they not be since I was in the business, so I asked them, I reaffirmed, what is your opinion about these appropriate deductions for my business, and they said absolutely.

Q    And was this a conversation you had with respect to both returns, the 2002 and the 2004?

A    It was a conceptual discussion about how these expenses which continued during those periods of time should be handled.

Q    But my question more specifically is do you recall that discussion with them with respect to both your 2002 and 2004 returns?

A    Only upon learning that these deductions would not be allowed.

Q    Okay.

A    But this issue basically existed before then because of a dispute over Schedule C and Schedule A, and it's the same issue, and I went to my accountants and I went to my lawyers and I said, am I accounting for these things properly?  They said, well, what did you spend it for?  Basically to create business, to create revenue, to create the things that I've described.  They said, well, these are Schedule C deductions plain and simple.

Q    And this is Mr. Howard Levinton and Mr. Perry Lerner?

A    Yes.  [Reproduced literally.]

Except for the above-quoted testimony of Mr. Ackerman about what he told Mr. Levinton and Mr. Lerner, there is no evidence in the record establishing what Mr. Ackerman told Mr. Levinton and Mr. Lerner when he discussed with them the propriety of petitioners' claimed Schedule C deductions. On the record before us, we find that petitioners have failed to carry their burden of establishing that Mr. Ackerman provided necessary and accurate information to Mr. Levinton and Mr. Lerner regarding petitioners' claimed Schedule C deductions. On that record, we further find that petitioners have failed to carry their burden of establishing that Mr. Ackerman reasonably relied on the advice of Mr. Levinton and Mr. Lerner in claiming the respective Schedule C deductions in the 2002 joint return[105] and the 2004 joint return. See Neonatology Associates, P.A. v. Commissioner, 115 T.C. at 99; Ma-Tran Corp. v. Commissioner, 70 T.C. at 173.

On the record before us, we find that petitioners have failed to carry their burden of establishing that there was reasonable cause for, and that they acted in good faith with respect to, the underpayment for each of their taxable years 2002

---

[105]Indeed, on the record before us, we find that petitioners could not have relied on any advice of Mr. Lerner in deducting the claimed Schedule C deductions in petitioners' 2002 joint return. That is because Mr. Lerner testified, and we have found, that he did not even become aware of respondent's position with respect to the respective claimed Schedule C deductions for 1997, 1998, and 2000 until around early 2005, which was more than a year after petitioners filed the 2002 joint return on Nov. 21, 2003.

and 2004 that is attributable to petitioners' claimed Schedule C deductions.

Based upon our examination of the entire record before us, we find that there is a substantial understatement of tax for each of petitioners' taxable years 2002 and 2004. On that record, we further find that petitioners have failed to carry their burden of establishing that they are not liable for each of their taxable years 2002 and 2004 for the accuracy-related penalty under section 6662(a).

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing, the concessions of respondent, and the concession of petitioners,[106]

Decisions will be entered

under Rule 155.

---

[106]See supra note 35 describing the concession by both respondent and petitioners with respect to the payment of $210,000 to Nevada Media Partners that petitioners deducted in the 1997 Schedule C and that respondent disallowed in the notice for 1997, 1998, and 2000.

APPENDIX A

On November 17, 1999, Somerville, virtually all of which Mr. Ackerman owned indirectly, formed Crown Davidson Partners, LLC (Crown Davidson Partners). On December 3, 1999, (1) Somerville invested $15 million in Crown Davidson Partners and (2) Crown Davidson Partners acquired 15,000 shares of preferred stock of Davidson Cotton.

On June 14, 2000, Somerville contributed its interest in Crown Davidson Partners, as well as $4,990,000, to Crown Davidson Investments, LLC (Crown Davidson Investments),[107] in return for which Somerville received a 62.47-percent interest in Crown Davidson Investments. As of June 13, 2000, Crown Davidson Investments owned a 99.8-percent interest and Kevin Gay owned a .2-percent interest in Crown Davidson Partners.[108]

As of June 13, 2000, Crown Davidson Holdings, LLC (Crown Davidson Holdings), owned a .03-percent interest, GARD Investments, Inc., owned a 25-percent interest, and J. Rothschild

---

[107]The record does not establish the percentage interest that Somerville owned in Crown Davidson Partners and contributed to Crown Davidson Investments; nor does it establish the date on which Somerville acquired that interest. It is not clear from the record whether Somerville acquired the percentage interest that it owned in Crown Davidson Partners and contributed to Crown Davidson Investments in exchange for the $15 million that it invested in Crown Davidson Partners.

[108]As of June 13, 2000, Crown Davidson Investments was the "managing member" of Crown Davidson Partners.

Nominees (Guernsey) Limited owned a 12.5-percent interest in Crown Davidson Investments.

As of June 13, 2000, the members of Crown Davidson Holdings were Crown Davidson Management, LLC (Crown Davidson Management),[109] and GARD Investments.[110]

---

[109]The record does not disclose the identities of the members of Crown Davidson Management.  The record does establish that, as of June 13, 2000, Mr. Deutschman served as the manager of that entity.

[110]The record does not disclose the respective percentages of Crown Davidson Holdings that Crown Davidson Management and GARD Investments owned.

APPENDIX B

On dates not disclosed by the record after the formation of Crown Fresh Direct, Somerville acquired an interest in Crown Fresh Direct. Thereafter, Somerville contributed that interest to Crown Fresh Direct Investments, LLC (Crown Fresh Direct Investments).[111]

As of April 29, 2003, the following owned the percentage interests listed in Crown Fresh Direct:[112]

| Owner | Percentage Interest |
|---|---|
| Crown Fresh Direct Investments | 98.1836 |
| Mr. Ba | .1534 |
| Mr. Calise | .3835 |
| Mr. Squire | .8959 |
| Judith Leedom Tyrer | .0890 |
| L-A & A Gift Trust for the Benefit of Nathanael Leedom Ackerman | .1473 |
| L-A & A Gift Trust for the Benefit of Elliot Leedom Ackerman | .1473 |

As of April 29, 2003, Crown Fresh Direct II, LLC (Crown Fresh Direct II), owned a 100-percent interest in Crown Fresh Direct Investments.[113]

---

[111]The record does not disclose the percentage of Crown Fresh Direct that Somerville acquired and contributed to Crown Fresh Direct Investments.

[112]As of Apr. 29, 2003, Crown Fresh Direct Investments was the "managing member" of Crown Fresh Direct.

[113]As of Apr. 29, 2003, Crown Fresh Direct Management, LLC (Crown Fresh Direct Management), was the "managing member" of Crown Fresh Direct Investments.

As of April 29, 2003, Somerville owned a 100-percent inter-est in Crown Fresh Direct II.[114]

As of April 29, 2003, the following owned the percentage interests listed in Crown Fresh Direct Management:

| Owner | Percentage Interest |
|-------|---------------------|
| Mr. Deutschman | 66.6 |
| Mr. Lerner | 25.9 |
| Mr. Squire | 2.5 |
| Mr. Leraris | 2.5 |
| Mr. Kaji | 2.5 |

---

[114]As of Apr. 29, 2003, Somerville was the "managing member" of Crown Fresh Direct II.  As of that date, Jason Ackerman was also a member of Crown Fresh Direct II.